*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0011P (6th Cir.)
File Name: 04a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellant/*
*Cross-Appellee,*

v.

ALFONSO G. ANGEL,
*Defendant-Appellee/*
*Cross-Appellant.*

Nos. 02-3320/3321

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-00727—James G. Carr, District Judge.

Argued: October 22, 2003

Decided and Filed: January 9, 2004

Before: KEITH, DAUGHTREY, and GILMAN, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Jeffrey P. Singdahlsen, UNITED STATES
DEPARTMENT OF JUSTICE, CRIMINAL DIVISION,
Washington, D.C., for Appellant. Susan M. Damplo,

Ardsley, New York, for Appellee. **ON BRIEF:** Joseph R.
Wilson, ASSISTANT UNITED STATES ATTORNEY,
Toledo, Ohio, Monica S. Abrams, UNITED STATES
DEPARTMENT OF JUSTICE, CRIMINAL DIVISION,
Washington, D.C., for Appellant. Susan M. Damplo,
Ardsley, New York, for Appellee.

GILMAN, J., delivered the opinion of the court, in which
DAUGHTREY, J., joined. KEITH, J. (pp. 27-38), delivered
a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. A jury convicted
Alfonso Angel of conspiring to both possess and distribute
cocaine and marijuana, all in violation of 21 U.S.C.
§§ 841(a)(1) and 846. The district court sentenced Angel to
360 months in prison, followed by 10 years of supervised
release. On this direct appeal, Angel's appellate counsel
contends that (1) Angel's trial counsel and the district court
allowed a biased member of the jury pool to sit on the jury,
and (2) Angel's trial counsel engaged in unconstitutional
discrimination by purposefully allowing this person, a
member of a racial minority, to remain on the jury.
Moreover, Angel has raised six additional issues in his pro se
brief concerning his sentence and allegations of prosecutorial
misconduct. The United States has cross-appealed,
contending that the district court committed clear error by
reducing Angel's offense level by two points for acceptance
of responsibility pursuant to United States Sentencing
Guidelines § 3E1.1, despite the fact that Angel went to trial to
challenge the essential factual elements of guilt, attempted to
have a government witness killed, and expressed no remorse
until the district court suggested it as a way to avoid a life
sentence. For the reasons set forth below, we **AFFIRM**
Angel's conviction, **REVERSE** the district court's two-level

reduction for acceptance of responsibility, and **REMAND** for resentencing.

## I. BACKGROUND

### A. Jury selection issues raised by Angel's counsel

Angel's first two arguments on appeal involve one particular juror, Delores Chandler, who served as the foreperson of the jury that convicted Angel. The parties have stipulated that Chandler is African-American. During jury selection, the following exchange occurred between Chandler and the magistrate judge:

THE COURT: And in looking at your questionnaire, one of the very important questions is whether or not you would be able to serve on the jury if the trial were to last from three to six weeks. And your response was that you are not able to sit on the jury. Have you had an opportunity to think about that response recognizing that it's an important obligation of citizenship to serve on a jury when called, and it certainly is inconvenient for everyone? Are you willing to serve if you are selected?

CHANDLER: I don't want to. If I have to, I will. But I don't want to.

THE COURT: Well, if you were selected would you then hold it against either of the parties? Would you hold it against the government or the defendants if you were selected to serve?

CHANDLER: No, I would not. I would not hold that against the parties or the government.

THE COURT: Or against the Court?

CHANDLER: Or against the Court.

THE COURT: All right. You've indicated that you don't want to serve, but do you recognize and agree that it is an important service that we are all required to perform from time to time?

CHANDLER: I recognize that if I have to do it, I'll do it. That's all I recognize.

THE COURT: All right. Could you tell us if it is not such a great invasion of your privacy as to why you're so reluctant to serve?

CHANDLER: I just I don't want to stay here in Toledo. I live an hour and a half away. I don't want to be here four to six weeks. That's the main reason.

THE COURT: All right. Do you understand that under our system of law every person is equal and every person is entitled to equal protection of the laws, and it's important to have jurors from various areas representing various backgrounds?

CHANDLER: Yes. I understand that. I just don't want to do it. But I perfectly understand that.

THE COURT: And even though you don't want to do it, you will agree to do it?

CHANDLER: Yes.

THE COURT: And if you were selected to serve as a juror, could you come into court and serve with an open mind?

CHANDLER: Yes.

THE COURT: And listen to the evidence that's presented here in court and the instructions of the judge as to the law to be applied in this case, and would you follow those instructions?

CHANDLER: Yes, I would.

Angel's lawyer, Sheldon Wittenberg, then had a chance to question Chandler:

WITTENBERG: My only concern, and I detect maybe – I don't know you, but it seems like there's a little level of anger okay, and it's at the situation rather than – you wouldn't hold it against my client, Mr. Angel, or any of the defendants?

CHANDLER: No. No, I wouldn't. I might sound like that. It's because I don't want to be here. That's the only –

[. . .]

WITTENBERG: [. . .] You've seen the panel, correct?

CHANDLER: Yes.

WITTENBERG: So it's important if we can get some minority representation on the panel if you're chosen as a juror. You do understand the way we feel?

CHANDLER: Yes.

WITTENBERG: So I could be assured that if you were chosen that given the other problems that are associated with the distance and the length of time, it could take as little as three or four weeks and as long as six; it may not take six, but given it would be at least a few weeks, you could give my client a fair and impartial hearing?

CHANDLER: Yes.

WITTENBERG: And if you were firmly convinced of your opinion, you would keep that and not just change to make the other ten or 11 happy?

CHANDLER: No, I wouldn't.

WITTENBERG: I believe you wouldn't.

After Wittenberg finished his questions, the lawyer for one of Angel's codefendants, in an apparent attempt to avoid Chandler being challenged by the government, asked her if she would "be fair to the United States government in hearing their evidence." "Yes, I would," Chandler replied.

Another defense lawyer then asked Chandler to "elaborate a little bit on what your views of the drug laws are," based upon one of her responses to the juror questionnaire form indicating that the drug laws should be more strict. Chandler replied:

Well, I don't know too much about them, but from what I hear is, like, the first time you get off, you pay a fine or something, and then the next time something else, and then finally you get around to being punished. So I think if you took care of it the first time, there probably wouldn't be a second and third.

The defense lawyer followed up by asking her what the punishment should be "the first time someone gets caught with drugs . . . ." Chandler responded: "Whatever the punishment is."

## B. Pro se issues

The six issues raised by Angel in his pro se brief all relate to either his sentence or to the alleged misconduct of the prosecutor. Rather than set forth the factual background for these issues here, the relevant facts are discussed as part of the analysis in Part II.C. below.

## C. The government's cross-appeal

At the second of three appearances in connection with Angel's sentencing, the district court raised the possibility of Angel receiving a sentence reduction by accepting responsibility pursuant to United States Sentencing Guidelines § 3E1.1. "I don't think the defendant's deserving of a life sentence," the court stated. "A 30-year sentence maybe also is severe." The court then suggested that "to the extent I'm able to do so, to give him credit for truly accepting responsibility . . . . I will consider that. The fact that he put the government to its proof and that it was a long and protracted trial doesn't matter to me." After making this suggestion, the court postponed the sentencing hearing to give Angel a chance to discuss the issue with his lawyer.

When the sentencing hearing resumed, Angel made the following statement to the court:

I understand the consequences that I face and that I owe a responsibility for the actions which I have, which I have done. I accept responsibility. Well, I'll get to that in a minute.

I'm sorry for being here on the judgment of this honorable court and regret doing so. I see the mistake I have made and the great cost to everybody involved. I broke the law of my country, and for that I shall be punished and separated from my family and loved ones.

After this general admission of responsibility, the following dialogue occurred between Angel and the court:

ANGEL: I would like to admit my guilt of the elements of the indictment, sir.

THE COURT: Each and every count of which you were found guilty?

ANGEL: Well, there are some I don't approve of, but at this position, I have to admit to all of them.

Angel then admitted that he was involved in the acquisition and distribution of "substantial" quantities of cocaine and marijuana and said that he "had a double life" as a restaurant owner and a drug distributor. He gave a detailed description of his drug-distribution network. Although Angel denied any direct involvement in one particular transaction involving 55 kilograms of cocaine, he said he understood that he was legally responsible for the transaction. Angel also admitted that he was involved in drug transactions beyond those charged in the present case. The court concluded that Angel had admitted the conduct "attributed to him in the indictment" and had also admitted that "the allegations against him brought by the government did not encompass all of his activities."

After Angel at least partially admitted his involvement in the charged drug transactions, the court asked about Angel's attempt to murder a government witness. According to the government's evidence, while Angel was in custody after he was indicted, he offered a fellow inmate, William Wainscott, $50,000 to kill one of the government's witnesses against Angel. Wainscott informed the FBI of the incident, and subsequent investigation confirmed some of the details of Wainscott's story.

Based on this attempted murder, the district court enhanced Angel's sentence by two points for obstruction of justice, pursuant to U.S. Sentencing Guidelines § 3C1.1. When the court asked Angel to admit responsibility for this conduct, however, Angel denied asking Wainscott to murder the government witness. Despite Angel's denial, as well as his reluctance to disclose his involvement with the cocaine-trafficking established at trial, the district court found that Angel qualified for a two-point sentence reduction for acceptance of responsibility. Both Angel and the government have filed timely notices of appeal.

## II. ANALYSIS

### A. Juror bias

Angel contends that juror Chandler was biased against him, and that both his trial counsel and the district court erred by allowing Chandler to remain on the jury. To demonstrate ineffective assistance of counsel, a defendant must show that his attorney's conduct "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). This court has also stated that

> [c]ounsel is also accorded particular deference when conducting voir dire. An attorney's actions during *voir dire* are considered to be matters of trial strategy. A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.

*Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

We will generally "not address on direct appeal claims of ineffective assistance unless the record has been sufficiently developed to provide meaningful factual review." *United States v. Brown*, 276 F.3d 211, 217 (6th Cir. 2002), *cert. denied*, *Scruggs v. United States*, 535 U.S. 1079. Direct appeal is the appropriate forum, however, for ineffective-assistance claims that either depend entirely upon facts within the record or that present purely legal questions. *See United States v. Wunder*, 919 F.2d 34, 37-38 (6th Cir. 1990) (considering ineffective-assistance claims on direct review where the claims were based entirely on facts within the record and/or could be resolved as a matter of law); *cf. United States v. Neuhausser*, 241 F.3d 460, 474 (6th Cir. 2001) (refusing to consider ineffective-assistance claims on direct

review where claims were based on facts outside the record or where the evidence in the record was not adequate to establish ineffective assistance as a matter of law).

In the present case, the record is adequate to allow us to address Angel's claims. The facts underlying both claims are undisputed and contained entirely within the record. Angel does not suggest that he will be able to develop any further evidence on collateral review. His claim of unconstitutional discrimination, moreover, presents the following pure question of law: Does the Equal Protection Clause prohibit a defense attorney from purposefully allowing a person to remain on the jury because of that person's race? No additional facts are necessary for the panel to resolve that question.

Because Angel's claim of error by the district court is being raised for the first time on appeal, we will apply the "plain error" standard of review. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997); *United States v. Page*, 232 F.3d 536, 543 (6th Cir. 2000); Fed. R. Crim. P. 52(b). Under plain-error review, the appellant must show (1) that there was an error, (2) that is clear and obvious, and (3) that affects substantial legal rights. *Johnson*, 520 U.S. at 467. If the appellant makes that showing, the court has discretion to consider the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations and quotation marks omitted). This court has recognized that district courts have "broad discretion" in conducting voir dire. *Hughes*, 258 F.3d at 457.

Angel must demonstrate that Chandler was *actually biased* in order to prove either that he was prejudiced by the alleged ineffective assistance of his trial counsel or that the district court committed reversible error. *See id.* at 457-58. Chandler told the district court that she was hesitant to serve as a juror because "I just I don't want to stay here in Toledo. I live an hour and a half away. I don't want to be here four to six weeks. That's the main reason." Contrary to Angel's

argument, this comment demonstrated nothing more than Chandler's general unwillingness to serve on the jury. The comment does not demonstrate that Chandler was actually biased against Angel.

Chandler also stated during voir dire that she believed that the drug laws should be more strict. Angel contends that this statement demonstrates that Chandler was actually biased against him. The Supreme Court, however, has held that a juror is impartial "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). In the present case, Chandler said that, if selected, she "would not hold [it] against the [defendants] or the government," could come into court with an open mind, and could listen to the evidence and follow the judge's instructions. She told the various defense attorneys that she would give Angel a fair and impartial hearing and would also be fair to the government in hearing its evidence. Chandler, in other words, assured the lawyers and the court that she could "lay aside [her] . . . opinion [about the drug laws] and render a verdict based on the evidence presented in court."

Both the Supreme Court and this court, moreover, have found no actual bias where the evidence of bias was much stronger than Chandler's general opinion about the drug laws. *See Patton v. Yount*, 467 U.S. 1025, 1029-30 (1984) (holding that the trial court did not commit manifest error by finding the jurors to be impartial, even though eight jurors admitted that, due to pretrial publicity, "at some time [prior to trial] they had formed an opinion as to [defendant's guilt]"); *see also United States v. Pennell*, 737 F.2d 521, 529-30 (6th Cir. 1984) (holding that there was inadequate evidence of actual bias where five jurors received threatening, late-night phone calls telling them to find the defendant guilty, and one juror stated that the phone calls might influence her judgment in the case). If the evidence in *Patton* and *Pennell* was not adequate to establish actual bias, then Chandler's general comments about the drug laws were certainly not sufficient. Angel has

therefore failed to demonstrate either that his trial counsel's failure to challenge Chandler "permeate[d] the entire trial with obvious unfairness," *Hughes*, 258 F.3d at 457, or that the district court committed plain error by allowing Chandler to serve on the jury.

## B.  Discrimination in jury selection

Angel next contends that his trial counsel engaged in unconstitutional discrimination by purposefully *including* Chandler on the jury because of her race. This alleged discrimination, Angel argues, supports his claims of ineffective assistance of counsel and error by the district court. Although the "plain error" standard of review generally applies to claims raised for the first time on appeal, *Johnson*, 520 U.S. at 466-67; *Page*, 232 F.3d at 543; Fed. R. Crim. P. 52(b), any racial discrimination in jury selection constitutes structural error that requires automatic reversal. *See Avery v. Georgia*, 345 U.S. 559, 561 (1953) (holding that jury selection based on race warrants reversal of a conviction regardless of the strength of the evidence presented); *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (holding that racial discrimination in the selection of grand jurors is structural error that requires automatic reversal).

Engaging in racial discrimination during the exercise of peremptory challenges violates the equal protection rights of both the defendant and the challenged juror. In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Although *Batson* based its holding on the Equal Protection Clause of the Fourteenth Amendment, which does not apply to actions of the federal government, *Batson* applies to federal court proceedings through the equal protection component of the Fifth Amendment's Due Process Clause. *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.")

Defense attorneys, like prosecutors, may not challenge potential jurors because of their race. *Georgia v. McCollum*, 505 U.S. 42, 59 (1992). Angel contends that his equal protection rights were violated when his counsel rejected an unspecified "otherwise qualified, white juror to make room for [Chandler] as a minority juror" and purposefully included Chandler on the jury because of her race.

Angel's argument that his trial counsel rejected an "otherwise qualified, white juror" fits within the *Batson-McCollum* framework, which prohibits defense attorneys from *excluding* jurors on account of their race. But this argument lacks support in the record. Angel does not contend that his trial counsel exercised peremptory challenges to excuse *any* juror who was placed in the jury box prior to Chandler, much less Angel's hypothetical "otherwise qualified, white juror." This argument is therefore unpersuasive.

Angel's alternative argument—that equal protection prohibits a defense attorney from using race as a reason to leave a minority on the jury—is questionable as a matter of law. He cites no case that directly supports his contention. Instead, Angel argues that *Batson*, *McCollum*, and the Supreme Court's other jury-discrimination cases stand for the general proposition that the Constitution prohibits *any* racial discrimination in the selection of jurors. The government, on the other hand, contends that no precedent supports Angel's argument, and that "[t]he thrust of [the Supreme Court's cases dealing with discrimination in jury selection] is to ensure minority representation on juries."

We agree that *Batson* and *McCollum* do not apply to the facts of the present case. Those Supreme Court cases prohibit the *act* of exercising peremptory challenges where that act is accompanied by the *intent* to discriminate on the basis of race. *See Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."); *McCollum*, 505 U.S. at 59 ("We hold

that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges.").

Regarding the requirement of a discriminatory act, there was no such conduct in the present case. Angel's trial counsel simply decided not to challenge Chandler. We find no support for the proposition that a defense attorney's *failure to challenge* a juror, even if motivated by race, implicates the equal protection rights of either the juror or the defendant.

We note that the dissent cites *Batson* for the general proposition that "the defendant [has] the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Dis. Op. at 28 (quoting 476 U.S. at 85). Although that is a correct statement of the law, the problem with applying *Batson*—or any other equal protection precedent—to the present case is that Angel's trial counsel *did not select any juror*. Angel's counsel, in fact, engaged in no affirmative act to control who sat on the jury.

All prior cases, including those cited by the dissent, have found equal protection violations only where some affirmative, discriminatory act was involved. *Batson* and *McCollum*, for example, do not prohibit prosecutors or defense attorneys from having racially based *thoughts*. Those cases instead prohibit the *act* of exercising a peremptory challenge where that act is motivated solely by the prospective juror's race.

In *City of Richmond v. J.A. Croson*, 488 U.S. 469 (1989), for example, the Supreme Court struck down the City of Richmond's plan that "required prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more Minority Business Enterprises (MBE's)." *Id.* at 477. Like the lawyers whose conduct was at issue in *Batson* and *McCollum*, the City of Richmond engaged in an affirmative,

discriminatory act—specifically, imposing the set-aside requirement upon prime contractors.

Similary, in *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002), the Second Circuit concluded that the district court had acted improperly by making an affirmative attempt to alter the racial composition of the jury. For example, "when an African-American empaneled juror was excused, the district court did not simply replace this juror with the first alternate, who was white, but instead, *sua sponte,* removed a second (white) juror from the panel and filled the two spaces this created with an African-American juror and with [a] Jewish [j]uror." *Id.* at 172. *Nelson* clearly did not involve a district court's failure to act. To the contrary, the alleged equal protection violation was the affirmative (and overzealous) act of the district court.

The dissent also points to the following language from *Davis v. School District of City of Pontiac*, 309 F. Supp. 734, 741-42 (E.D. Mich. 1970): "When the power to act is available, the failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance that situation. Sins of omission can be as serious as sins of commission." Dis. Op. at 29. Although this language, considered in isolation, appears to support the dissent's argument that the failure to act can violate equal protection principles, a review of the facts of *Davis* demonstrates that the quoted language actually supports our conclusion in the present case.

In *Davis*, members of the school board had "intentionally utilized the power at their disposal to locate new schools and arrange boundaries in such a way as to perpetuate the pattern of segregation within the City and thereby, deliberately, in contradiction of their announced policies of achieving a racial mixture in the schools, prevented integration." *Id.* at 741. The equal protection violation in *Davis*, therefore, was not simply the school board's failure to act, but its failure to remedy the effects of its prior affirmative, discriminatory acts.

*See id.* at 742 ("This Court acknowledges the recently enunciated position that a Board of Education has no affirmative duty to eliminate segregation when it has done nothing to create it, but this Court finds that the Pontiac Board of Education did a great deal to create the patterns presently existing within that school district and is now responsible to take action so as to eliminate the very situation which it caused."). *Davis* therefore supports our conclusion that there can be no equal protection violation without some affirmative, discriminatory act.

*Batson*, *McCollum*, *Croson*, *Nelson*, and *Davis* all prohibit harmful affirmative acts undertaken with a racially discriminatory intent. They do not, however, stand for the proposition that the Constitution's equal protection guarantee prohibits racially based thoughts without a corresponding act. Lawyers do not select jurors, after all; they only *remove* prospective jurors. Chandler, for example, was seated on the jury not because of Angel's lawyer, but as a result of the jury-selection procedures used in the Northern District of Ohio. Assuming that those procedures are constitutional, *Batson*'s requirement was satisfied because Chandler was in fact "tried by a jury whose members [were] selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85. Regardless of Wittenberg's state of mind, the lack of any affirmative, discriminatory act means that there was no equal protection violation in this case.

In addition to the legal weakness of Angel's position, his argument is questionable as a matter of policy. All of the Supreme Court's jury-discrimination cases to date prohibit both the government and the defense from *excluding* potential jurors because of their race. If we were to go beyond these rulings by holding that the Fifth Amendment can be violated whenever a lawyer decides to leave a member of a racial minority on the jury because of that person's race, we would be flying in the face of the general policy behind the Supreme Court's decisions, which is to allow members of racial minorities to serve on juries.

Adopting Angel's argument would also undermine a defendant's Sixth Amendment right to the effective assistance of counsel. In a case like the present one, where the defense attorney in good faith believes that the benefit of having a particular minority juror decide the client's case outweighs any negative aspects of that juror, the defense attorney would nevertheless be required to remove the juror with a peremptory challenge. The defense attorney, in other words, would be required to act contrary to what he or she perceives to be the best interests of the client. We thus disagree with the dissent's contention that "a reasonable defense attorney with a client, like Angel, who has a prior drug conviction, would most likely excuse Chandler for cause or, if a for cause objection was not granted, exercise a peremptory challenge . . . ." Dis. Op. at 36-37. To the contrary, we find nothing unreasonable in defense counsel's presumed belief that having at least one racial minority on the jury would outweigh the potential negative impact of that juror's generalized opinion of the drug laws. We would also note that any attempt to challenge Chandler for cause would have been futile. See Part II.A. above for a discussion of the relevant cases.

Finally, Angel's argument conflicts with the fundamental principle that the law does not prohibit wrongful intent without an accompanying act. The criminal law, for example, has long recognized that "[t]he mere harboring of an evil thought, such as the intent to engage in criminal conduct, does not constitute a crime; a crime is committed only if the evil thinker becomes an evil doer." 1 Wharton's Criminal Law § 25 (15th ed. 2003). Here, Angel urges us to hold that the Constitution's equal protection guarantee requires the reversal of a conviction simply because trial counsel allegedly harbored the "evil thought" of leaving Chandler on the jury because she is African American. Neither precedent nor policy supports Angel's position, and we reject it.

## C. Claims raised in Angel's pro se brief

Angel raised the following six additional arguments in his pro se brief: (1) the district court erred in calculating the quantity of drugs attributed to him for sentencing purposes, (2) the evidence does not support a sentence enhancement for being an organizer or leader, (3) the district court erred in attributing to Angel 55 kilograms of cocaine discovered in a Jeep Cherokee, (4) prosecutorial misconduct deprived him of due process, (5) the evidence does not support a sentence enhancement for obstruction of justice, and (6) he was deprived of his Sixth Amendment right to a jury trial because the district court, rather than the jury, determined the drug quantities for which Angel was held responsible.

The first two arguments are easily disposed of because the district court's findings are supported by overwhelming evidence. Witnesses testified that Angel was responsible for delivering approximately 359 kilograms of cocaine, far in excess of the 150 kilograms necessary for a base offense level of 38 pursuant to U.S. Sentencing Guidelines Manual § 2D1.1. Angel contends that the witnesses who testified about these drug quantities were not credible, but this court "defers to the district court on credibility determinations unless they are without foundation," *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998) (quotation marks omitted), and the record does not demonstrate that the testimony was "without foundation." Regarding the enhancement for being a leader or organizer, the district court heard abundant testimony that Angel was the leader or organizer of many people as part of a large drug distribution ring in Ohio. We again have no reason to question the credibility determination of the district court.

Angel's third argument, regarding the district court's decision to attribute the 55-kilogram seizure to Angel, is also based upon an evaluation of witness credibility. Witnesses testified that Angel owned the Jeep Cherokee in which the drugs were found and that the cocaine was going to be

delivered to him. In his pro se brief, Angel points to nothing that demonstrates that the district court's determination regarding the credibility of these witnesses was "without foundation." *See id.*

Angel's fourth claim, that he was deprived of due process because of prosecutorial misconduct, lack support in the record. One of his contentions is that the government knowingly presented perjured testimony both to the grand jury and at trial. "[A] conviction obtained through the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). But the allegedly perjured testimony presented to the grand jury was not offered at trial, and therefore could not have affected the jury's verdict. As to the testimony presented at trial, Angel contends that the testimony of one of the government's witnesses was inaccurate and internally inconsistent. Even assuming for the sake of argument that Angel is correct, there is no evidence in the record to demonstrate that the government had any knowledge that the witness's testimony was false.

Angel also contends that the prosecution withheld exculpatory information from the grand jury. The government, however, has no judicially enforceable duty to provide a grand jury with exculpatory evidence. *United States v. Williams*, 504 U.S. 36, 47 (1992).

Angel's final allegation of prosecutorial misconduct is based upon his argument that the prosecution failed to disclose exculpatory evidence to him, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). But the prosecutors in this case had an open file policy, allowing the defense to view all relevant materials in the government's possession. The government also credibly contends that the evidence discussed by Angel either was in fact provided to him or does not exist.

Angel's fifth contention is that the evidence was insufficient to support an obstruction-of-justice enhancement. A district court's decision to impose an obstruction enhancement must be sustained unless clearly erroneous. *United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002). An obstruction enhancement is appropriate where a defendant directly or indirectly threatens, intimidates, or otherwise unlawfully influences a codefendant, witness, or juror, or attempts to do so. U.S. Sentencing Guidelines § 3C1.1, cmt. n.4(a).

In the present case, the district court based its enhancement on the facts set forth in the Presentence Report, which states that Angel offered Wainscott $50,000 to kill a government witness. Angel allegedly told Wainscott to use one of the rifles that Angel had stored at his residence. After Angel made the offer, Wainscott tore out a page of a phone book that listed the witness's name and phone number and sent the page to his mother, presumably as proof of Angel's offer. Government agents corroborated Wainscott's story by (1) recovering the torn page from Wainscott's mother, (2) discovering that a phone book in the jail where Angel and Wainscott were in custody was missing the page with the witness's number on it, and (3) finding several rifles, pursuant to a search warrant, in the area indicated by Wainscott. In light of this corroboration, the district court did not clearly err by adopting the facts from the Presentence Report.

The facts accepted by the district court, moreover, were sufficient to support an obstruction-of-justice enhancement. This court has upheld obstruction enhancements based upon conduct far less serious than Angel's. *See, e.g., United States v. Bingham*, 81 F.3d 617, 632 (6th Cir. 1996) (upholding an obstruction enhancement where the defendant wrote letters to his girlfriend attempting to persuade her to testify falsely); *United States v. Moss*, 9 F.3d 553-54 (6th Cir. 1993) (upholding an obstruction enhancement where the defendant solicited a codefendant to bribe a witness). This precedent persuades us that the district court did not clearly err by

imposing an obstruction enhancement based upon Angel's attempt to murder a government witness.

Angel's sixth and final contention is that he was deprived of his Sixth Amendment right to a jury trial when the judge determined the relevant drug quantities at sentencing. The Supreme Court has held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). In the present case, the jury returned a supplemental verdict finding that Angel had conspired to distribute, and conspired to possess with the intent to distribute, at least 5 kilograms of cocaine and 1000 kilograms of marijuana. The jury's finding mandated a sentence of between 10 years and life in prison. *See* 21 U.S.C. § 841(b)(1)(A).

Angel was sentenced to 360 months in prison, which is within the range mandated by the jury's verdict. Both the United States Supreme Court and this court have held that *Apprendi* applies only where a judge imposes a sentence exceeding the range authorized by the jury's verdict. *See Ring v. Arizona*, 536 U.S. 584, 588-89 (2002) (stating that *Apprendi* "held that the Sixth Amendment does not permit a defendant to be expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone") (emphasis in original) (quotation marks omitted); *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000) (holding that *Apprendi* does not apply where the court sentenced the defendants to prison terms that were no greater than the 20-year term authorized by the jury's verdict); *United States v. Chapman*, 305 F.3d 530, 535 (6th Cir. 2000) ("*Apprendi* has never been held to apply to every fact that increases the defendant's sentence within the rubric of the guidelines.").

In the present case, the jury's verdict authorized a maximum punishment of life imprisonment. Angel's

sentence of 360 months therefore renders *Apprendi* inapplicable. We also note that Angel now faces a potential sentence of greater than 360 months because we are reversing the two-point reduction for acceptance of responsibility. So long as the new sentence imposed by the district court does not exceed life imprisonment, however, the sentence will be within the range authorized by the jury's verdict.

## D. Downward departure for acceptance of responsibility

The district court granted Angel a two-point sentence reduction for acceptance of responsibility pursuant to U.S. Sentencing Guidelines § 3E1.1(a), which provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels." (Emphasis in original.) "To qualify for this reduction, the defendant bears the burden of showing by a preponderance of the evidence that he or she has accepted responsibility for the crime committed." *United States v. Williams*, 940 F.2d 176, 181 (6th Cir. 1991). "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S. Sentencing Guidelines § 3E1.1, cmt. n.5. The district court's determination regarding acceptance of responsibility must be sustained unless clearly erroneous. *United States v. Webb*, 335 F.3d 534, 537-39 (6th Cir. 2003).

The government contends in its cross-appeal that the acceptance-of-responsibility reduction is not available to Angel because he went to trial to challenge the factual elements of the government's case. An application note to § 3E1.1 states that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." § 3E1.1, cmt. n.2. The note recognizes there might be an exception to this rule in "rare situations," such as "where a defendant goes to trial to assert and preserve issues that do not

relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*  But the note cautions that even in these rare situations, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." *Id.*

This court emphasized the significance of *pretrial* statements and conduct that express remorse in *United States v. Williams*, 940 F.2d 176 (6th Cir. 1991), where the defendant had sent a letter expressing remorse to the district judge only after conviction.  The district court in *Williams* granted the sentence reduction, but this court reversed on the ground that the defendant's expression of remorse came too late, stating: "A letter sent prior to sentencing but after conviction does not reflect the type of timely acceptance of responsibility envisioned in the Sentencing Guidelines." *Id.* at 182.  This court also emphasized that "where, as here, the defense consists of a denial of criminal conduct, the reduction is not appropriate." *Id.* at 182.  Like the defendant in *Williams*, Angel went to trial to deny all criminal conduct and admitted responsibility for his crimes only after he was convicted.  Moreover, Angel's remorse was not spontaneous, but came at the suggestion of the district judge.  Comparing the facts of *Williams* to the facts of the present case leads us to conclude that the district court clearly erred by granting Angel a reduction for acceptance of responsibility.

The government next contends that the district court clearly erred by granting the reduction because Angel also received a sentence enhancement for obstruction of justice pursuant to U.S. Sentencing Guidelines § 3C1.1.  An application note to § 3E1.1 (Acceptance of Responsibility) states that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be *extraordinary* cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." § 3E1.1, cmt. n.4 (emphasis added).  The

defendant has the burden of proving the extraordinary nature of his or her case. *United States v. Mahaffey*, 53 F.3d 128, 135 (6th Cir. 1995).  We review de novo a district court's determination that a case is extraordinary. *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003), *cert. denied*, *Lockhart v. United States*, 72 U.S.L.W. 3239 (U.S. Oct. 6, 2003) (No. 02-11164).

This court's decision in *Gregory* provides an instructive example of circumstances where an acceptance-of-responsibility reduction is appropriate despite an obstruction-of-justice enhancement.  According to the court in *Gregory*, "[a]ppropriate considerations for determining whether a reduction is warranted include the defendant's truthful admission of the offense conduct, the defendant's voluntary assistance to authorities in resolving the offense, and the timeliness of defendant's conduct in affirmatively accepting responsibility for his actions." 315 F.3d at 640.  The court concluded that a reduction was warranted because Gregory confessed a week after committing the crime, agreed to cooperate with federal authorities, urged his sister—who was also involved in the crime—to cooperate as well, and pled guilty. *Id.*  Although Gregory had initially obstructed justice by attempting to persuade his sister not to talk to federal officials, "he effectively undid that conduct" by calling her the next day and "urging her to cooperate." *Id.*  The court emphasized that "[a]ll of his obstructive conduct predated his indictment, and he has never denied his own responsibility and guilt." *Id.* at 641.

In contrast to *Gregory*, several decisions of this court illustrate circumstances where an acceptance-of-responsibility reduction is not appropriate.  One is *United States v. Rapanos*, 235 F.3d 256 (6th Cir. 2000), *vacated on other grounds by* 533 U.S. 913 (2001), where the defendant went to trial to challenge the applicability of a statute to his conduct rather than to challenge the factual elements of his guilt. This court reversed the district court's grant of the reduction, noting that the defendant's pretrial conduct—ignoring cease-and-desist

orders from government agencies, refusing to fill out required paperwork, and refusing to provide requested financial information to a probation officer—did not clearly demonstrate acceptance of responsibility. *Id.* at 260-61. Similarly, in *United States v. Wilson*, 197 F.3d 782 (6th Cir. 1999), the defendant received an obstruction enhancement for lying about his legal name to the probation office and magistrate judge in the course of a plea agreement. This court affirmed the district court's decision to deny an acceptance-of-responsibility reduction. Despite the fact that the defendant had pled guilty, this court emphasized that he "had no right to mislead the court and the probation office about his birth name and criminal history." *Id.* at 787. Finally, in *United States v. Mahaffey*, 53 F.3d 128, 135 (6th Cir. 1995), this court upheld the district court's decision to deny an acceptance-of-responsibility reduction because the defendant also received an obstruction enhancement for "making false statements during his grand jury testimony."

Like the defendants in *Rapanos*, *Wilson* and *Mahaffey*, Angel obstructed justice and made no effort to repudiate that obstruction. Angel would not even admit to the district court that he had offered Wainscott $50,000 to kill the government witness, despite the court's finding that this event occurred and that it constituted a basis for the obstruction-of-justice enhancement. Attempting to have a witness killed, moreover, is far more serious than ignoring government orders (*Rapanos*), lying about a legal name and criminal history (*Wilson*), or making false statements to the grand jury (*Mahaffey*). Even more significant is the fact that, unlike the defendant in *Gregory*, Angel's obstructive conduct happened *after* he was indicted. Angel never attempted to undo that conduct, he offered no assistance to the authorities, and he went to trial to challenge the essential factual elements of guilt. Comparing the above cases to the one now before us demonstrates that the district court clearly erred by granting Angel the acceptance-of-responsibility reduction.

In sum, we conclude that the government is correct in asserting that the sentence reduction was inappropriate. Angel is precisely the type of defendant mentioned in the notes to § 3E1.1 "who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S. Sentencing Guidelines § 3E1.1, cmt. n.2. As in *Williams*, Angel's expression of remorse came too late. Angel's case, moreover, does not present the kind of extraordinary circumstances where both allowing an acceptance-of-responsibility reduction and imposing an obstruction enhancement is appropriate. *See* U.S. Sentencing Guidelines § 3E1.1, cmt. n.4. Although the district court's desire to grant the reduction in order to allow Angel to avoid a life sentence is perhaps understandable, the decision cannot be sustained under the Guidelines.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** Angel's conviction, **REVERSE** the district court's two-level reduction for acceptance of responsibility, and **REMAND** for resentencing.

---

## CONCURRING IN PART, DISSENTING IN PART

---

DAMON J. KEITH, Circuit Judge, concurring in part, dissenting in part. I join the court's opinion in Parts II.A., II.C., and II.D. I write separately to express my disagreement with the court's resolution of Angel's discrimination in jury selection claim in Part II.B. I would hold that defense counsel's use of race as the criterion for choosing Chandler violated the Equal Protection Clause of the Fourteenth Amendment, as incorporated into the Fifth Amendment, of the United States Constitution. As an error in jury selection is a structural error that requires automatic reversal, I would grant Angel a new trial. Accordingly, I respectfully dissent.

The issue before the court is one of first impression - whether the inclusion of a juror, who expressed views contrary to the defendant's interest, violated the Equal Protection Clause when that inclusion was based on race. Rather than seriously considering the merits of the claim, the majority simply agrees with the government that there is no precedent. In finding that there is no precedent, the majority opinion interprets *Batson v. Kentucky*, 476 U.S. 79 (1986), too narrowly. It states that *Batson* prohibits "the *act* of exercising peremptory challenges where that act is accompanied by the *intent* to discriminate on the basis of race." Op. at 13 (emphasis in original). Thus, according to the majority, because defense counsel did not exercise a peremptory challenge or otherwise challenge Chandler, the Equal Protection Clause is not violated even if defense counsel's inclusion of Chandler was based on her race.

While it is true that the court in *Batson* prohibited the discriminatory use of peremptory challenges, there is no suggestion that its holding was so narrow as to exclude the discriminatory misuse of an otherwise valid and intelligent peremptory challenge. Moreover, there is no indication that

the prohibition against the use of race in the jury selection process applies exclusively to peremptory challenges. To the contrary, the Court in *Batson* stated, "the defendant [has] the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85-86 (citing *Martin v. Texas*, 200 U.S. 316, 321 (1906)). The Court went on to explain, "[c]ompetence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply is unrelated to his fitness as a juror." *Id.* at 87 (internal quotations and citations omitted). Finally, in summarizing its previous holdings, the Court stated that it "has made clear that the Constitution prohibits *all forms* of purposeful racial discrimination in selection of jurors." *Id.* at 88 (emphasis added). Thus, I can not hold, as does the majority, that *Batson* and its progeny are limited to the context of peremptory challenges on the basis of race, and cannot accept the majority's further implication that the concept of use within the context of peremptory challenges is so narrow as to exclude its correlative, misuse.

The majority fixates on the need for a discriminatory *act* and finds that the *"failure to challenge* a juror, even if motivated by race" does not implicate the equal protection rights of either the juror or the defendant because the failure to challenge is not an *act.* It is at this point that the majority's reasoning squeezes the concept of use into the word "act," and in so doing strips the word use of its intended power. Yet, even the word act itself is inclusive enough to cover the conduct at issue is this case. According to Black's Law Dictionary: "In its most general sense, [act] signifies something done voluntarily by a person; the exercise of an individual's power; an effect produced in the external world by an exercise of the power of a person objectively, prompted by intention, and proximately caused by a motion of the will." BLACK'S LAW DICTIONARY 24 (6th ed. 1991). Specifically, the majority looks to the criminal law in an attempt to circumscribe the conduct at issue. Op. at 17 ("The criminal law, for example, has long recognized that '[t]he mere

harboring of an evil thought, such as the intent to engage in criminal conduct, does not constitute a crime; a crime is committed only if the evil thinker becomes an evil doer.") (citation omitted). In its attempt, however, the majority circuitously concludes that the conduct of defense counsel was not an affirmative act, and therefore must have been limited to a thought. Acts have both a positive and negative face. The definition of a "criminal act" states that: "There can be no crime without some act, affirmative *or negative*. An omission or failure to act may constitute an act for purposes of criminal law." *Id*. (emphasis added).

As I stated many years ago in *Davis v. School District of City of Pontiac, Inc.*,"[w]hen the power to act is available, failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance that situation. Sins of omission can be as serious as sins of commission." *Davis*, 309 F. Supp. 734, 741-42 (E.D. Mich. 1970), *aff'd*, 443 F.2d 573 (6th Cir. 1971), *cert. denied*, 404 U.S. 913 (1971).[1]  Thus, the misuse

---

[1] The majority counters that *Davis* lends support to its conclusion. It states that the "equal protection violation in *Davis*, therefore, was not simply the school board's failure to act, but its failure to remedy the effects of its prior affirmative, discriminatory acts." Op. at 15. Yet, *Davis* condemns both affirmative and negative discriminatory acts. The wrongfulness of a negative discriminatory act is dependent on whether the "power to act is available," not on the necessary creation of the harm. We are presented with an analogous situation here. Defense counsel "intentionally utilized the power at [his] disposal to" accept or reject a juror "in such a way as to perpetuate" racial stereotypes by including Chandler on the jury because of her race. We know this because he stated to Chandler that it was important to get some "minority representation" on the jury. The process, properly considered, had both a cause - the volition of defense counsel - and an effect - the inclusion of Chandler, and, whether termed affirmative or negative discrimination, offended the principles of equal protection. Moreover, the district court was aware of defense counsel's race-based action, and, like the school board in *Davis*, its constitutional violation was its failure to act to remedy defense counsel's actions. In this way, both the defense counsel and the district court acted in a way that was offensive to the constitution.

of a peremptory challenge, properly considered, occurs when there is an abuse of the principles of equal protection that "prohibit[] *all forms* of purposeful racial discrimination in selection of jurors," whether it comes in the form of an omission or commission.

Here, defense counsel's misuse, or act, was his choice to include Chandler based on her race.[2]  Once this constitutionally offensive deed was done, the harm could not be left to lie; the Equal Protection Clause is not self-correcting. Defense counsel was not going to object to his own race-based action. The prosecutor was not going to object because it is in the government's interest to have a juror who thinks the sentencing laws should be stricter. The district court had "the power to act" to correct defense counsel's improper jury selection methods, and its "failure to take the necessary steps so as to negate or alleviate" the harmful situation was fatal. *Davis*, 309 F. Supp. at 741-42. Thus, the failure to protect Angel's rights was complete.

Ultimately, the district court is responsible for ensuring that there is a constitutionally composed jury. The Supreme Court explained this in *Powers v. Ohio*, when it stated that "the courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in" the statutory prohibition on discrimination in the selection of jurors, 18 U.S.C. § 243, enacted pursuant to the Fourteenth Amendment's Enabling Clause. 499 U.S. 400, 416 (1991). Once the jury selection process was tainted by defense counsel's use of race to include Chandler, the acceptable remedy was for the district court to "discharge the venire and select a new jury from a panel not previously associated with

---

[2] The majority conceptualizes Chandler's inclusion on the jury as a starting point, or as a given. Yet, because inclusion is only possible after a process (voir dire) has occurred, it cannot be the default position.

the case." *Batson*, 476 U.S. at 99 n. 24.[3] Rather than washing the jury of its racial taint, the district court allowed the racially composed jury to stand.

Nor do I find the majority's distinction between inclusion and exclusion convincing.[4] The majority appears to agree with the government's argument that the policy behind *Batson* and its progeny is to "ensure minority representation on juries." Op. at 12. How far then are parties and judges allowed to go in order to ensure such minority representation? In *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002), a case involving a hate crime committed by an African American man against a Jewish man, the Second Circuit found that the district court had gone too far in trying to ensure a racially and religiously balanced jury. At trial, the district court "expressed its desire to empanel a jury (and not merely *begin from a venire*) that represents this community." Nelson, 277 F.3d at 172 (internal quotations and citations omitted) (emphasis in original). To that end, the district court denied a *Batson* challenge to the fact that the government used 55% of its peremptory challenges to strike African American candidates from the jury. *Id*. Next, the district court denied a for-cause challenge of a Jewish juror who had "expressed grave doubts about his ability to be objective about the case." *Id*. Finally, when an African American empaneled juror was excused, the district court failed to

---

[3] The other potential remedy mentioned in *Batson* is to "disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." *Batson*, 476 U.S. at 99 n.24. If reinstatement is a remedy for improper exclusion, then the corresponding remedy for improper inclusion might appear to be to strike the racially tainted juror. Because the first *Batson* remedy is sufficient to remedy the harm in this case, however, the appropriateness of the alternative remedy need not be addressed.

[4] In an effort to lessen the affirmative nature of the act at issue in this case, the majority seeks to characterize the inclusion as "using race as a reason to leave a minority on the jury." Op. at 12.

replace the juror with the first alternate, who was white, and instead removed a second white juror from the panel and filled the two spaces with an African American juror and the previously mentioned Jewish juror. *Id*. The district court took these steps to obtain an empaneled jury that contained both African Americans and Jews in a racial and religious balance so that "nobody could complain whatever the result" of the trial. *Id*. (quoting Tr. 866). The defendants consented to the proposal on the record. *Id*.

In finding that the district court's actions were improper, the Second Circuit stated, "the error is made plain by the reasoning behind" *Batson* and *Georgia v. McCollum*, 505 U.S. 42 (1992), "in which the Supreme Court held that neither prosecutors nor defendants could, without violating the Equal Protection Clause, exercise peremptory strikes on the basis of race." *Nelson*, 277 F.3d at 207. The court went on to explain that "it is beyond peradventure that the racial and religious reconstruction of the jury . . . could not have been achieved at the instigation of the parties." *Id*. "And what the district court could not allow the parties to do, it also could not do of its own motion even with the consent of the parties." *Id*. The court specifically discounted the argument that inclusion is different from exclusion when it stated, "although the motives behind the district court's race- and religion-based jury selection procedures were undoubtedly meant to be tolerant and *inclusive* rather than bigoted and *exclusionary*, that fact cannot justify the district court's race-conscious actions." *Id*. at 207 (emphasis added).[5] Further, the court stated that if

---

[5] The majority attempts to distinguish *Nelson* by stating that "*Nelson* clearly did not involve a district court's failure to act . . . the alleged equal protection violation was the affirmative (and overzealous) act of the district court" Op. at 15. Nowhere in my discussion of *Nelson* do I downplay the district court's acts. To the contrary, my discussion of *Nelson* highlights all of the conduct that the district court engaged in for the purpose of ensuring a racially and religiously balanced jury. *Nelson* is used to show that, in the jury selection process, both inclusion and exclusion based on race violates the Equal Protection Clause. The

parties and the court were allowed to agree to empanel a jury that was "precisely of the racial and religious mix they wished," then "the Supreme Court's language about 'race neutrality in jury selection' as a 'measure of the judicial system's commitment to the commands of the Constitution,' . . . would be a dead letter." *Id.* at 208 (quoting *Powers v. Ohio*, 499 U.S. 400, 416 (1991)).

Like *Nelson*, the defense attorney in this case wanted to *include* Chandler, or to use the majority's language, wanted "to leave" Chandler on the jury because of the need for "minority representation." To that end, the attorney kept Chandler, who had expressed her views that the sentencing laws need to be stricter, rather than strike her and risk empaneling another white juror. In other words, the defense attorney "selected or reaffirmed a particular course of action [approving of Chandler as a juror] at least in part 'because of,' not merely 'in spite of,'" Chandler's race. *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (explaining the showing needed for a finding of discriminatory purpose).[6] And by failing to strike Chandler

---

majority cites *Nelson* for the proposition that a district court acts improperly when it "mak[es] an affirmative attempt to alter the racial composition of the jury." Op. at 14. The act cited by the majority as offensive in *Nelson*, however, was when the district "removed a second (white) juror from the panel and filled the two spaces created with an African American and with [a] Jewish juror." Op. at 14. Thus, the majority characterizes the filling in of the two spaces in *Nelson*, that is the inclusion of the two jurors based on their race, as an affirmative act. Yet, the majority refuses to recognize that the inclusion of Chandler in this case based on her race was an act. The harm in *Nelson* and this case is the use of race to determine the composition of the jury. As the Second Circuit found, and as I would now find, both the exclusive and inclusive action involved in composing such a jury are individually and collectively offensive to the principles of equal protection.

[6]The majority states that "[l]awyers do not select jurors, after all; they only *remove* prospective jurors. Chandler, for example, was seated on the jury not because of Angel's lawyer, but as a result of the jury-selection

---

as should have been done, and as would have been done had it not been for Chandler's and the other potential jurors' race, an otherwise qualified white juror was necessarily excluded because of race. Thus, this inclusion carries with it an exclusion.

Even if an inclusion did not carry with it a corresponding exclusion, the fact that the inclusion was based on race renders it just as harmful as an exclusion based on race. In *Powers v. Ohio*, the Supreme Court rejected the idea that racial classifications in jury selection may survive equal protection scrutiny simply because white jurors are subject to the same risk of discrimination as are all other jurors. The Court stated, "[i]t is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree." *Powers*, 499 U.S. at 410 (citing *Loving v. Virginia*, 388 U.S. 1 (1967)). Further, as we have learned from the affirmative action context, both exclusionary and inclusionary discrimination can offend equal protection principles. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (holding that governmentally conferred

---

procedures used in the Northern District of Ohio." Op. at 15 (emphasis in original). Thus, according to the majority, "Chandler was in fact 'tried by a jury whose members [were] selected by nondiscriminatory criteria.'" Op. at 16 (citation omitted). The majority's explanation of jury selection is overly simplistic. The majority's logic supports only the conclusion that the venire was "selected by nondiscriminatory criteria." In jury selection there is a venire and following voir dire, the attorney must make a choice about each potential juror. The attorney may accept a juror (by failing to challenge the juror) or reject a juror (through the use of a for cause or peremptory challenge). The failure to strike a juror signifies the attorney's approval of a particular juror. If that approval was based solely on race, then the jury was not "selected by nondiscriminatory criteria" and the attorney acted improperly.

benefits based on race, just like detriments, can be offensive to the Equal Protection Clause).[7]

The majority next argues that "[a]dopting Angel's argument would also undermine a defendant's Sixth Amendment right to the effective assistance of counsel." Op. at 16. The Sixth Amendment right to counsel, to the extent that it protects counsel's freedom to make strategic decisions concerning the composition of the jury, has been held to give way to the Fourteenth Amendment's guarantee of equal protection under the law. *Batson*, in fact, stands for the proposition that a strategic decision concerning a juror, based on the race of the juror, is offensive to the Fourteenth Amendment, and must, therefore, yield to the equal protection guarantees contained in the Fourteenth Amendment. *Batson*, 476 U.S. at 98-99. Likewise, to the extent that the strategic decision of counsel in this case offends the guarantee of equal protection, it must give way. Neither the majority nor the government has cited anything in our jurisprudence that allows counsel to cloak one constitutional violation in the garb of another constitutional protection.

The majority finds "nothing unreasonable in defense counsel's presumed belief that having at least one racial

---

[7]The majority's attempt to distinguish *City of Richmond v. J.A. Croson* further highlights the disagreement that is at issue in this case. I cited the *Croson* case to further bolster the Second Circuit's conclusion in *Nelson* that, in the context of jury selection, both inclusion and exclusion can violate the Equal Protection Clause. Thus, I cited *Croson* to explain that in contexts other than jury selection, benefits and detriments based on race are examined under the Equal Protection Clause under the same standard. The majority seeks to distinguish *Croson* by stating that there was an affirmative discriminatory act in that case, imposing the set-aside requirement upon prime contractors, and that such an affirmative discriminatory act does not exist in this case. Op. at 14. The dispute in this case is whether there was a discriminatory act. Thus, the majority's recitation of the facts in *Croson* does nothing to undermine the notion that inclusion and exclusion are treated the same under the Equal Protection Clause.

minority on the jury would outweigh the potential negative impact of that juror's generalized opinion of the drug laws." Op. at 16-17. The majority's "presumed belief," however, is nothing more than a euphemism for stereotyping. As the Supreme Court has stated, "potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state- sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 128 (1994). Defense counsel's "presumed belief" that the race of Chandler outweighs the fact that she expressed her unwillingness to serve and stated that it takes until the third time a defendant is convicted before he gets punished is the exact type of racial stereotyping expressly rejected in *Batson*. 476 U.S. at 98 (finding that the Equal Protection Clause forbids the State to strike Black veniremen on the assumption that they will be partial to the defendant because of their shared race).

The majority offers "virtually no support for the conclusion that [race] alone is an accurate predictor of juror's attitudes;" yet it holds that "the same stereotypes that justified the wholesale exclusion of [racial minorities] from juries" may be used to outweigh the negative aspects of choosing a particular juror. *J.E.B.*, 511 U.S. at 139. I can not hold, as does the majority, that a juror's race may outweigh the other potential negative aspects of that juror. Such a finding feeds into the very stereotypes that *Batson* and its progeny try to combat.

Furthermore, there is no support for the proposition that race may be used as a factor in jury selection. *Batson*, 476 U.S. at 87 ("A person's race simply is unrelated to his fitness as a juror.") (citation omitted). The record does not reveal any "neutral explanation," unrelated to race, that justifies the choice of Chandler. *Batson*, 476 U.S. at 98 (explaining that once the defendant has made a prima facie case, the State must come forth with a neutral explanation for striking a particular venireman). Moreover, because a reasonable defense attorney with a client, like Angel, who has a prior drug conviction, would most likely excuse Chandler for cause

or, if a for cause objection was not granted, exercise a peremptory challenge, the only reasonable conclusion based on this record is that race was not only a factor, but the moving force behind the decision to include Chandler.

Finally, the majority argues that the fact that defense counsel "allegedly harbored the 'evil thought' of leaving Chandler on the jury because she is African American" is not enough to require reversal of Angel's conviction. Op. at 17. The majority is correct in stating that the law does not prohibit the harboring of an "evil thought." "Neither precedent nor policy" has recognized a way to discern an evil thought without a corresponding action. When the "evil thought" is, as in this case, transformed into words and actions, however, "[n]either precedent nor policy supports" turning a blind eye to the unconstitutional conduct.

It is the dialogue between an attorney and a potential juror that leads an attorney to accept or reject a juror. An examination of that dialogue may also "support or refute an inference of discriminatory purpose" on the part of the attorney. *Batson*, 476 U.S. at 97. In this case, defense counsel stated, "you've seen the panel, correct?" After Chandler responded, "yes," defense counsel stated, "so it's important if we can get some minority representation on the panel if you're chosen as a juror. You do understand the way we feel?" J.A. at 518. The exchange between defense counsel and Chandler reveals defense counsel's "evil thoughts." When defense counsel included Chandler, by failing to challenge her despite her views on the drug sentencing laws and her unwillingness to serve, he pursued a specific course of action in furtherance of his "evil thought," and thus became an "evil doer." The majority's focus on the *affirmative act* of exercising a peremptory challenge to the exclusion of the *affirmative act* of speaking and the *negative act* of deciding not to challenge a juror, when those *acts* reveal unconstitutional conduct, is unacceptable.

The words out of defense counsel's own mouth demonstrate that his actions were motivated by race. When coupled with the surrounding circumstances, there can be no doubt that the principle of race neutrality in jury selection, embodied in the Equal Protection Clause, was violated. The majority's slight-of-hand, however well-intentioned, is incapable of reducing constitutionally-offensive discriminatory acts into constitutionally-acceptable "evil thoughts."

Therefore, I respectfully dissent.