**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jack Lewis THOMAS, Defendant–
Appellant.**

**No. 02–2391.**

United States Court of Appeals,
Sixth Circuit.

July 29, 2004.

Daniel L. Lemisch, Detroit, MI, for Plaintiff–Appellee.

William J. Winters, III, Farmington, MI, for Defendant–Appellant.

Before BOGGS, Chief Judge; DAUGHTREY, Circuit Judge; and ALDRICH, District Judge.*

ANN ALDRICH, District Judge.

In June 2002, a jury in the Eastern District of Michigan convicted defendant-appellant Jack Thomas of two counts of armed bank robbery, in violation of 18 U.S.C. § 2113(a), and one count of possessing a firearm in furtherance of a robbery, in violation of 18 U.S.C. § 924(c). The district court sentenced Thomas to 135 months imprisonment for each robbery, to run concurrently, plus 84 months on the firearm conviction, to run consecutively to the robbery sentences. Thomas contends: (1) the district court erred in excluding a potentially exculpatory "excited utterance" he made to the arresting officer; (2) it abused its discretion by failing to instruct the jury regarding eyewitness identification; (3) the prosecution's closing argument was improper and denied him a fair trial; (4) the district court abused its discretion in denying him an opportunity to cross-examine a witness regarding a shootout the witness had with the police; and (5) the evidence was insufficient to support the convictions. Thomas also contends that the district court erred in enhancing his sentence for obstruction of justice. For the reasons that follow, we affirm.

## I. BACKGROUND

### A. Evidence that Thomas Committed Armed Robbery of the Dearborn Bank

The superseding indictment charged that Thomas committed armed robbery of the Rouge Employees Credit Union in Dearborn, Michigan in August 2000. The drawer of teller Yolanda Chandler reflected a shortage of $22,700 for the day of the robbery. *See* JA 205–209. Bank teller Yolanda Chandler was on the job on August 3 when two men entered the bank shortly after 9:30 a.m. One man stood in the foyer, near the door, waving a handgun around; he had "tar or something all over his face" and a green outfit like that worn by the nearby Rouge Steel Factory workers.

The other man, who the tellers said was "thinner built" and somewhat shorter than the first, approached Chandler's window. This man reached into his overalls, pulled out a bag and slid it under the window, and told Chandler, "not to do anything, and don't push any buttons. Put the money in the bags." Meanwhile, the man in the foyer yelled "get down motherf ---

---

* The Honorable Ann Aldrich, United States District Judge, Northern District of Ohio, sitting by designation.

ers," while holding the gun with both hands and pointing it in the direction of the tellers. That caused Chandler to "freeze" and focus on the "guy standing in front of" her window. Chandler placed about $20,000 in the bag and gave it to the thinner man. *See* JA 168–171. This second man was later identified as Reginald Lenton by his own confession and by the testimony of accomplice Donald Martin.

After taking cash from Chandler, Lenton moved over to the next window, manned by head teller Ronnie Holly, and again demanded money, whereupon Holly set off the alarm. Holly confirmed there were two robbers, one "kind of crouched down at a [teller] window" and another at the door who waved a gun "all around" and told "everyone to get down." JA 183. Holly remembered that the big man at the door was wearing a dust mask and a hat, but he "didn't really get a good look at" him and did not see his face; he did testify that the photos introduced by the government appeared to depict the gunman he saw. Holly also testified that the gun introduced by the government was similar to the type held by the big man at the door. *See* JA 183–201.

A third teller, Latice Jones, saw a "black African–American, tall built," at the door who was holding a gun and wearing "like a dirty rouge steel work getup with a white tee-shirt, gas mask on his face ... we really couldn't see his face." *See* JA 220–23. Teller Yolanda Chandler testified that she got a "glimpse" of the man standing by the door, whom she characterized as "a big guy," but she could not really describe his facial features. Chandler could not recall what, if anything, this man had covering his face. She described the gun that he pointed at an adjacent teller merely as "big and black." *See* JA 172–73. Head teller Ronnie Holly also recalled that the man at the door was "about like 6'3", 6'4". Kind of a big man." *See* JA 183–201.

Likewise, teller Latice Jones described the gunman at the door as "tall built." Jones characterized this man as similarly built to Thomas in height and weight. *See* JA 224. Consistent with other witnesses' testimony, bank employee Sharron Williams described the gunman as a "very large gentleman, I'd say about 6'4"." *See* JA 233–34.

As for the shorter or slighter-built man who approached her window and demanded money, Chandler recalled he seemed to have a gas mask over his face. Chandler estimated his height and opined that Thomas was similarly built, but she was unable to identify Thomas or anyone else in the courtroom as having robbed the bank. *See* JA 173–78. After completing the robbery, the two men walked out the door and across the parking lot towards an alley. *See* JA 188–189 (Holly).

B. Evidence that Thomas Committed Armed Robbery of Harper Woods Bank

About two months later, Thomas participated in Reginald Lenton's armed robbery of the Bank One branch in Harper Woods, Michigan on October 13, 2000. Bank teller Patrice Murphy testified that a man walked up to her window and tendered a handwritten note reading, "This is a stick-up. I got a gun / fill this bag. No dye packs or will danger a customer shoot it [sic]." Murphy described him as a black man in his "mid 30's, maybe early 40's," with a dark complexion and standing 5'9" to 6'0" tall. Apparently fearing that Murphy was about to activate the alarm, the man said to her, "Don't even try it. Don't try it." Murphy gave him $1600, including "bait money." The bait money bore her initials and had been photocopied "to catch crooks whenever we get robbed." Murphy identified the cash introduced by the gov-

ernment as the bait money. *See* JA 239–247.

## C. Thomas's Flight and Arrest Immediately After Second Bank Robbery

At 12:08 p.m. that same day, Harper Woods police officer James Ramberger was on duty and in uniform in his patrol car when he received a radio report that a bank robbery had just occurred at Kelly and Woodcrest, which he knew to be Bank One. As Ramberger approached that location he saw "a gray Pontiac turn off at Woodcrest coming south toward me." Ramberger ended up facing the Pontiac at a four-way intersection and could see the driver was "a large, black male." JA 259–61. When the Pontiac kept sitting still, Ramberger motioned for it to proceed. When the driver did so, Ramberger made a U-turn and pulled behind the Pontiac to obtain its license plate number. As soon as he did so, however, the Pontiac began accelerating, running stop signs and red lights and reaching speeds of 80–95 mph on residential streets limited to 25 mph. Fellow Officer Robert Vitale joined the pursuit in his car until the Pontiac stopped in Detroit. *See* JA 262–65, 294–95.

When Ramberger pulled up to the Pontiac, he saw Thomas exiting the driver's side, saw the passenger's door was also open, and saw a second man running down the alley. *See* JA 265. Ramberger drew his gun and ordered the driver "three or four times" to put his hands up. Instead of complying, the driver stood outside the Pontiac with the door open, keeping one arm inside the car where Ramberger could not see it. Then the driver started walking towards Ramberger with his arms at his side, and Ramberger could not see the driver's hands. The driver showed his left hand but kept walking towards Ramberger despite the command to get down on his knees. By this time Vitale had pulled his car to the left of Ramberger and drawn his weapon. Ramberger testified that the driver "appeared like he was trying to make a decision whether he was going to run or stay or what he was going to do" and "was sizing up if he had an escape route or not." *See* JA 267–68.

Ramberger placed Thomas in custody and searched the car. "Laying [sic] on the driver's floor, right between the pedals and the seat, was what appeared to me to be a 9 millimeter handgun" right below where Thomas's hand was before he exited the car. The officers also found a green jacket on the passenger seat. *See* JA 269–72. Vitale testified that Thomas was the driver of the Pontiac, which was registered to Thomas. *See* JA 289, 330–34. Ramberger identified the handgun introduced by the government as the one he found by Thomas's seat. *See* JA 269–71. The state crime lab test fired that 9 mm and found it operable, but it had no identifiable fingerprints. *See* JA 322 and JA 325–27. Once Ramberger had Thomas secured, Vitale pursued the man whom they had seen fleeing from the passenger side. Aided by Officer Robert Root, Vitale captured the passenger, fleeing through a residential backyard, five minutes later. Vitale identified the passenger as Reginald Lenton. *See* JA 291–92, 304–305. Vitale retraced the chase route in an effort to recover evidence; he recovered several items of clothing and a purse, but no weapon or cash. *See* JA 306 (Root).

A fourth Harper Woods policeman, Lt. Michael Bramos, testified that at about 12:36 p.m. he saw a "black male running with a wad of cash in his hand … being chased by a police officer." Bramos pulled his car "right up on" the fleeing man, who "stopped, looked at me, put the wad of cash in the bushes and jumped the fences." Bramos stayed with the cash and broadcast the direction that the man was running. *See* JA 315–16. Reggie Lenton pled guilty and cooperated.

### D. Testimony of Thomas's Accomplices

Lenton is the stepson of Thomas's father-in-law, Donald Martin, and lives in Martin's house in Detroit. Lenton admitted committing the first robbery and testified that all three men planned it at the Martin home. According to Lenton, Thomas came up with the idea of disguising themselves as workers from the nearby factory, which Lenton did by wearing a hard hat, a face mask, and a dust mask with two filters. *See* JA 349–52, 358. On the morning of August 3, 2000, Thomas came to Martin's house, whereupon Martin produced a .32 revolver and Lenton produced a 9 mm. The three men drove to the bank in Martin's SUV, and Lenton's account matches the other witnesses': i.e., Thomas stayed by the door, wielded a handgun, and threatened that no one should move because "this is a robbery", while Lenton approached a teller and demanded money, whereupon he and Thomas left the bank and walked to Martin's SUV, where they divided the $22,000. *See* JA 353–56.

Lenton also admitted his involvement in the second robbery, at the Harper Woods bank. According to Lenton, he planned this robbery with Thomas as well; Lenton wrote the "stickup" note but Thomas advised him what to write. On the morning of the second robbery, Thomas drove to Lenton and Martin's house, saw the same two handguns on the table, and stuck the 9 mm in the front of his pants. Lenton took the .32 revolver. Thomas and Lenton drove in Thomas's car, a grey Pontiac, to the Harper Woods bank, where Lenton alone entered and robbed the bank. *See* JA 361–70. Lenton's account of the ensuing chase corroborates the account of the officers: i.e., Thomas drove very fast, placing the 9 mm on the floor before getting out, while Lenton jumped out and ran, jettisoning his gun and the cash in a bush, and was soon apprehended. *See* JA 370–72, 374.

Donald Martin likewise admitted his involvement in both robberies. Martin had an account at the credit union since 1974 and so was familiar with the layout and knew the credit union had neither a security guard nor bulletproof teller windows. He helped Thomas and Lenton plan the robbery at his house in Detroit, where Thomas and Lenton put on hats and put scotch tape on their fingers and shoe polish on their faces. Martin testified that he provided a .32 revolver and Lenton provided a 9 mm, and the three men drove to the credit union in Martin's SUV. *See* JA 442–45. Martin parked two blocks away, and Thomas and Lenton walked to the credit union, with Thomas carrying both guns. Fifteen minutes later, Thomas and Lenton returned. The three men drove to an area near Martin's house to divide the spoils. *See* JA 417–22. Martin identified the 9 mm introduced by the government as the gun Thomas took from Martin's house into the credit union. He also testified that the bank's surveillance photographs depicted Thomas holding a gun. *See* JA 421–22.

Martin testified that he also planned the second robbery with Thomas and Lenton, as well. On the morning of October 13, 2000 Thomas arrived at Martin's house, picked up Lenton and the same two guns, and headed out to find a bank to rob. Martin recalled Thomas calling him and saying that Lenton had been scared to rob the bank but was just coming out of one. *See* JA 427–29.

### E. Presentence Investigation Report Recommends Obstruction Enhancement

At the time of the robberies, Thomas was fifty, stood 6'3" and weighed 265–270 pounds. His criminal history score was zero, placing him in Category I. The

Guideline range was 108 to 135 months of imprisonment for each robbery. *See* JA 629 and 637. The PSR recommended enhancing Thomas's offense level by two levels for obstruction of justice based on testimony that he had threatened to kill a prosecution witness. *See* JA 591–621. Thomas's acquaintance Ollie Sanders testified that in September or October 2000, Thomas confided that he had come up with an idea for a bank robbery and explained the details. Thomas admitted that he had recently robbed a bank, during which he pulled out two guns and yelled, "all of you M–F–, this is a stickup." *See* JA 462–67.

Lenton testified that while he was incarcerated pending trial, Thomas drove Sanders to the prison several times to visit him. *See* JA 381. Sanders testified that at Thomas's instruction, he told Lenton to "keep his mouth shut"; Martin explained that Thomas was afraid that Lenton would cooperate with the police. *See* JA 430–431, 468. When Thomas found out Lenton was cooperating, he asked Sanders to find out where Lenton was housed so he could have someone "kill him." Thomas told Sanders he had connections in prison who could kill Lenton. *See* JA 470 (Sanders).

Two days before Sanders was scheduled to testify, Thomas threatened him and told him to "take the Fifth." Thomas told Sanders that if he testified, Thomas would "see you in Saginaw," the state prison where Sanders was serving time for a state robbery conviction. Sanders understood this to mean that Thomas would have him killed in prison. On the morning of June 5, 2002, while in Wayne County Jail waiting to be transported to federal court for Thomas's trial, Sanders saw Thomas inciting other inmates regarding Sanders and Lenton "snitching" on him. Thomas said to Lenton, in front of other prisoners, "that's the m-f --- ing snitch." Later that morning, Sanders initially refused to testify against Thomas. *See* JA

338–341 and 471 (Sanders); JA 383 (Lenton).

## II. ANALYSIS OF THOMAS'S CONVICTIONS

A. Under the Excited Utterance Exception to the Hearsay Rule, The District Court May Have Committed Harmless Error in Excluding Thomas's Statement to Arresting Officers

■ At the time of Thomas's arrest, he told Officer Ramberger that he had been carjacked. Thomas contends the district court erred in excluding that statement as hearsay. Federal Rule of Evidence 803(2) provides,

> Hearsay Exceptions, Availability of Declarant Immaterial The following are not excluded by the hearsay rule, even though the declarant is available as a witness.
>
> \* \* \* \* \* \*
>
> (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition.

There are three elements necessary for the admission of an excited utterance. There must be an event startling enough to cause nervous excitement; the statement must be made before there is time to contrive or misrepresent; and third, the statement must be made while the person is under the stress of the excitement caused by the event. *See Haggins v. Warden*, 715 F.2d 1050, 1057 (6th Cir.1983).

As the party seeking to introduce hearsay, Thomas had the burden of showing that the excited utterance exception applied. *See Guest v. Bailes*, 448 F.2d 433, 436 (6th Cir.1971). The district court's ruling that the exception did not apply is examined for abuse of discretion. *See United States v. Mack*, 258 F.3d 548, 553

(6th Cir.2001). An abuse of discretion occurs when "the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses [an] erroneous legal standard." *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir.1995).

The district court heard argument on the government's motion *in camera,* but the record does not include a transcript thereof. The district court did not issue an opinion, either. Thus, all we have to explain the exclusion of Thomas's statement is the statement from the bench at the start of trial:

> The record should reflect the Court had an opportunity to meet in chambers with counsel to discuss a number of preliminary matters.
>
> The first was a motion *in limine* filed by the Government earlier on in the case, I believe it was back in December, to which [defense counsel]'s predecessor had filed a response.
>
> The motion was to preclude the defendant from offering or eliciting any testimony concerning the statement made by the defendant to the arresting police officer at the time of the defendant's apprehension.
>
> The statement, as I understand it, was to the effect that the defendant got out of the car and said to the police officer, I've been carjacked.
>
> \*     \*     \*     \*     \*     \*
>
> The defendant[']s other position is that this constituted an excited utterance under Rule 803. I do not believe that it constitutes an excited utterance under Rule 803 for the following reasons.
>
> First, there is a great deal of debate over whether the excited utterance exception [sic] can be used to prove the substance of the event itself.
>
> In other words, can the excited utterance be used to prove the truth of the substance of the event which is the subject of the excited utterance.
>
> Some Court's [sic] have permitted it under very limited circumstances. However, generally, courts require at least some independent corroborative evidence of the occurrence or the truth of the subject of the excited utterance before the excited utterance can be offered for its truth.
>
> I am not aware, after talking with counsel as to the testimony of the witnesses, that any other witness will be offered by either party that could independently corroborate the truth of Mr. Thomas's statement made [to] the police officer at the time of his apprehension.
>
> As such and because of the potential for calculation inherent in that statement, as it is a statement of excuse or alibi, I believe that it does not rise to a sufficient level of trustworthiness, such that it be admitted under the excited utterance exception.
>
> So ... the Government's motion *in limine* with respect to Mr. Thomas's statement will be granted.

JA 38:18 to 40:22.

Thomas contends that "it can hardly be disputed that being held at gunpoint and forced to drive an automobile at high speeds would cause nervous excitement." As to the second and third elements of the excited utterance exception, Thomas contends that he made his statement "immediately upon [his] arrest and before there was time to fabricate a story, and while under the stress caused by the carjacking." Thomas's Brief at 25–26. We have numerous grounds on which to reject Thomas's argument. We doubt whether a high-speed chase would be a startling event for someone who had just robbed a bank and must have considered the possi-

bility that the police would arrive in time to attempt pursuit.

Officer Ramberger testified that when Thomas finally stopped the car, he did not have "any look of panic on his face" and "it appeared like he was trying to make a decision whether he was going to run or stay or what he was going to do." JA at 267. The rationale for the excited utterance hearsay exception is that "such statements are given under circumstances *that eliminate the possibility of fabrication, coaching, or confabulation,* and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous." *United States v. Schreane,* 331 F.3d 548, 563 (6th Cir.2003) (emphasis in original). The circumstances in this case fall far short of the *Scheane* requirements.

Because we are not entirely clear on which basis the district court denied the motion *in limine,* we note that if there were any error, it would be harmless. We consider the impact on Thomas's right to a fair trial, *United States v. Lucas,* 357 F.3d 599, 608 (6th Cir.2004) (citation omitted), namely, what effect the utterance reasonably might have had on the jury's decision. *See United States v. Suarez,* 263 F.3d 468, 484 (6th Cir.2001) (citation omitted), *cert. denied,* 535 U.S. 991, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002).

The record amply supports the district court's impression that Thomas's carjacking claim was untrustworthy and strained credulity, to say the least. The jury could not have credited Thomas's carjacking claim unless they disbelieved all the testimony of Martin and Lenton about the second robbery—testimony that was both internally consistent and consistent with one another. The jury would also have to disbelieve Martin and Lenton's testimony that they planned and committed the *first*

robbery with Thomas; otherwise they would not be able to credit Thomas's statement that on the day of the second robbery, he was carjacked by Lenton, *whom he claimed he did not know.* In short, there was overwhelming evidence that Thomas was not a carjacking victim but rather a willing and active participant in two armed robberies.

## B. The District Court Did Not Abuse Its Discretion by Failing to Instruct the Jury Regarding Identification

■ Thomas next contends that the district court abused its discretion by failing to instruct the jury regarding identification. Because Thomas did not request such an instruction and did not object to the instructions given, we review the district court's failure to give that instruction only for plain error. *See United States v. McGee,* 173 F.3d 952, 957 (6th Cir.1999). Identification instructions are within the trial court's discretion and need be given only where there is a danger of misidentification due to the lack of corroborative evidence. *See United States v. Boyd,* 620 F.2d 129, 131 (6th Cir.1980) (citation omitted); *accord United States v. Robinson,* 2003 WL 22093632, at *2 (4th Cir. Sept.10, 2003) (no error in refusing to give identification instruction where there was "plenty of additional identification evidence"); *United States v. Thoma,* 713 F.2d 604, 607 (10th Cir.1983) (due process does not require jury instruction on identification where the government's case rests on the testimony of more than one witness).

Here there was no danger of misidentification based on the teller-eyewitnesses' testimony, because both of Thomas's accomplices testified, at length and in detail, that it was Thomas who planned and conducted the robberies with them. *See United States v. Patterson,* 150 F.3d 382, 387–88 (4th Cir.1998) (in prosecution for

bank robbery, identification instruction not necessary where "two witnesses [defendant's accomplices] who knew the defendant testified that he had participated in the robbery in addition to the eyewitnesses who testified to seeing him"). Moreover, Thomas was able to establish that none of the banks' employees could positively identify him, and the prosecution made clear that it did not claim otherwise. *See United States v. Tipton,* 11 F.3d 602, 608 (6th Cir.1993) (where defense counsel's cross examination and closing argument make the jury aware of the weaknesses or limitations of certain witnesses' testimony regarding identification of the defendant, there is no need for a special identification instruction), *cert. denied,* 512 U.S. 1212, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994).

It would be inappropriate to require an identification instruction, then, because the case against Thomas did not rest predominantly, let alone solely, on the eyewitnesses' rough estimates of the robbers' sizes and descriptions of their heavily disguised appearance. *See United States v. Montelbano,* 605 F.2d 56 (2d Cir.1979) (instruction not required where conviction did not rest on identification alone, but also on "unusually probative circumstantial evidence [and] false exculpatory evidence indicating consciousness of guilt"); *United States v. Greene,* 591 F.2d 471, 474–77 (8th Cir.1979) (in determining whether court should have given identification instruction, "the basic question is whether the eyewitness testimony is essential to support a conviction").

## C. The Prosecution's Closing Argument Was Not Improper

Thomas contends that the prosecution's closing argument included an improper comment and improper questions that deprived him of his right to fair trial. Whether a prosecutor's closing argument amounts to misconduct rendering the trial fundamentally unfair, is a mixed question of law and fact that we review *de novo. See United States v. Clark,* 982 F.2d 965, 968 (6th Cir.1993). We first determine whether the closing argument was improper. Only if the argument was improper do we consider whether it was flagrant and warrants vacating the resulting conviction. *See United States v. Carroll,* 26 F.3d 1380 (6th Cir.1994). The question of flagrancy requires us to consider whether the statements: (1) tended to mislead the jury or prejudice the defendant; (2) were extensive or isolated; (3) were deliberate or accidental, as well as (4) the total strength of the evidence. *See United States v. Carter,* 236 F.3d 777, 783 (6th Cir.2001) (citation omitted).

■ First, the prosecutor stated, "everybody involved in these robberies who testified told you he's the man. That evidence has been uncontroverted * * * that the defendant is the man." JA 530:1–3. At that point Thomas's counsel objected, the Judge agreed with the objection at sidebar, and the prosecutor corrected his argument to conform to the evidence presented:

(The following was held at the bench, outside the hearing of the jury.)

[DEFENSE]: * * * I don't believe the witnesses all said that he is the man. But that's—

THE COURT: It's a little bit of an exaggeration.

[PROSECUTOR]: All the witnesses.

THE COURT: All the witnesses said he had the same bold [build?] type and the same type. They didn't say he was the man.

[PROSECUTOR]: I meant to say all the witness[es] who participated in the robberies. I'll stand corrected.

THE COURT: Thank you.

(The following was held in open court.) * * *

[PROSECUTOR]: All of the witnesses *who participated in these robberies or heard the defendant talk about the robberies,* also told you that he's the robber. All the people that have first-hand knowledge of who did that crime say Jack Thomas in [is] the robber, he is the man that committed the crime.

JA 530:1 to 531:11 (emphasis added). Indeed, in its last statement before asking the jury to convict, the prosecutor reiterated the correct characterization of the testimony, stating, "And that *everybody involved in the robbery at the Rouge* says that's the guy that you see in these pictures. The defendant is the man who robbed the Rouge along with Reginald Lenton." JA 534:10–13 (emphasis added). If the prosecutor's initial mischaracterization of the testimony could have misled or confused the jury, his more limited restatements of his argument cured any prejudice to Thomas.

The prosecution was entitled to remind the jury that the witnesses involved in the robberies *unanimously* testified that Thomas was involved, as the jury could legitimately attribute significance to their unanimity. *See United States v. Peck,* 62 Fed.Appx. 561 (6th Cir.2003) (not improper to state that virtually no evidence supported defendant and "virtually every bit of evidence that came in points in one singular direction, and that is directly at [the defendant]"); *United States v. Drake,* 885 F.2d 323 (6th Cir.1989) (not improper to remark, "The evidence is not at all in dispute. * * * I'm sure that it will be disputed. But the evidence is overwhelming. It is unrebutted and it is consistent."); *Heffelfinger v. Thompson,* 444 F.Supp. 309, 310–11 (E.D.Tenn.1977) (not improper to remark, "nothing has contradicted the evidence the State has put on before you.").

■ Later, the prosecutor asked rhetorical questions in reference to the second robbery, the one where Thomas stayed in the car and Lenton went into the bank on his own:

*What does he want you to believe, that he was simply a taxi driver that day? He didn't know Reggie [Lenton] was going to rob a bank?* He lets a guy get in the car that's wearing three or four shirts, three hats, two pairs of pants, shoe polish on his face, sunglasses. *What's he going to claim, I didn't know?* How about when he comes out? What does he do when he [leads] them on the chase?

JA 512 (emphasis added). Rhetorical questions are permissible. *United States v. Green,* 305 F.3d 422, 430 (6th Cir.2002). There is no merit to Thomas's argument that these questions infringed on his constitutional right to remain silent. Thomas's right not to testify includes the right not to have the prosecution comment on that choice, whether in the prosecution's case in chief, on cross examination, or in closing argument. "[T]he Fifth Amendment forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *United States v. Robinson,* 485 U.S. 25, 30, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (citation and internal quotation marks omitted). But that is not what this prosecutor did. He simply called the jury's attention to the ample evidence suggesting that Thomas well knew he was taking Lenton to a robbery and helping him escape afterwards. Prosecutors can "summarize the evidence and comment on its quantitative and qualitative significance." *United States v. Bond,* 22 F.3d 662, 669 (6th Cir.1994); *see also United States v. Kohler,* 87 Fed.Appx. 530 (6th Cir.2004) (not improper for prosecutor to urge reasonable inferences based on evidence presented). In short, the prosecutor's questions were neither a direct comment nor an indirect comment on

Thomas's exercise of his right not to testify.

## D. There Was Ample Evidence to Support Thomas's Convictions

■ In assessing the sufficiency of evidence presented in a criminal trial, "all of the evidence is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Reasonable inferences must be permitted from basic facts to ultimate facts, and there need not be direct evidence supporting every element of the crimes charged. *See United States v. Townsend*, 796 F.2d 158, 161 (6th Cir.1986). Indeed, circumstantial evidence alone can sustain a guilty verdict, and it need not exclude every reasonable hypothesis except that of guilt. *See Branning v. United States*, 784 F.2d 361, 362 (6th Cir.1986). Moreover, in reviewing a challenge to the sufficiency of the evidence, we accord the same weight to direct and circumstantial evidence. *See United States v. Prince*, 214 F.3d 740, 746 (6th Cir.), *cert. denied sub nom. White v. United States*, 531 U.S. 974, 121 S.Ct. 417, 148 L.Ed.2d 322 (2000).

Taken together, the physical evidence and the testimony of the bank employees, the police, and Thomas's accomplices strongly tended to show that: (1) other than the fact that he had just participated in a bank robbery, Thomas gave no explanation for driving at life-threatening speeds to elude the police except his unbelievable carjacking story, *cf.* JA 528:13–19 and JA531:21 to 532:10 (prosecutor's rebuttal to defense closing); (2) the 9 mm handgun used in the first robbery was the same one found on the driver's side floor of the car Thomas was driving when he was apprehended; (3) Thomas's height was within the range the first bank's tellers gave for the gun-wielding robber's height, and his build fit their general description of that robber; (4) Thomas

bragged to Sanders about committing the first robbery and getting ready to commit the second one; (5) the jacket found in Thomas's car when he was apprehended matched the description of the jacket worn by one of the robbers, including not just the color but also the "shipping and receiving" label, *see* JA 245–47 (Murphy); (6) the cash that Lenton was seen to discard after jumping out of Thomas's car and running, included the "bait" bills that the second bank had just given to an armed robber, as proved by their serial numbers and the initials of the bank's assistant manager, *see* JA 239–43 (Murphy) and 253–55 (Dutz). Last but not least, if the jury believed Sanders's testimony, Thomas's efforts to intimidate him from testifying strongly suggests consciousness of guilt.

On this record, a "rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *United States v. Kincaide*, 145 F.3d 771, 781 (6th Cir.1998) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

## E. The District Court Did Not Abuse its Discretion by Denying Thomas the Opportunity to Cross–Examine Witness Sanders Regarding Sanders's Prior Conviction

■ As discussed above, Ollie Sanders testified that Thomas bragged he had committed a bank robbery and had an idea for another one, and that Thomas threatened to have him killed if he so testified. The district court permitted Thomas to impeach Sanders by bringing up the fact that Sanders had been convicted of six bank robberies. *See* JA 475. The district court also permitted Thomas to impeach Sanders by bringing up the fact that Sanders accepted money from Thomas that he knew was stolen, had been released from

prison for bank robbery immediately preceding the Dearborn robbery, helped plan the Harper Woods robbery, and knew that guns were to be used in both robberies. The district court refused, however, to let Thomas's counsel bring up the fact that Sanders had engaged in a shootout with police after a robbery. *See* JA 486–89. Thomas contends that the district court erred because the shootout was "crucial to an understanding of Sanders' character for truthfulness. He had testified regarding his apparent fear of Thomas, yet was apparently not fearful when he engaged in a gun battle with police." Thomas's Brief at 30.

Thomas's argument lacks merit. Federal Rule of Evidence 608(b) provides,

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness.

*See, e.g., United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (under 608(b), evidence showing defendant and defense witness's membership in prison gang was probative of witness's possible dishonesty and bias, because gang's tenets required members to lie and cheat to protect each other); *United States v. Hurst,* 951 F.2d 1490, 1500–1501 (6th Cir.1991) (evidence that witness had attempted to bribe policeman to file false document was admissible under 608(b)), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992).

Thomas has not cited a single decision holding that a witness's commission of a violent act bears on his character for truthfulness, and we have found none. On the contrary, we have held that "armed robbery does not involve fraud, deceit, or the telling of a falsehood. Defense counsel offers no case in which a violent crime was allowed into evidence to prove untruthfulness." *United States v. Perkins,* 187 F.3d 639, 1999 WL 506980, at \*5 (6th Cir. June 7, 1999), *cert. denied,* 528 U.S. 944, 120 S.Ct. 360, 145 L.Ed.2d 281 (1999). Although *Perkins* is not binding, we find its reasoning sound. *Accord United States v. Flaharty,* 295 F.3d 182, 191 (2d Cir.) ("murder generally is not a crime of dishonesty, and nothing about the Evans murder suggested that it would in any way reflect on [the murderer-witness]'s truthfulness"), *cert. denied,* 537 U.S. 936, 123 S.Ct. 37, 154 L.Ed.2d 237 (2002), *and cert. denied sub nom. Johnson v. United States,* 538 U.S. 915, 123 S.Ct. 1502, 155 L.Ed.2d 241 (2003). The district court correctly ruled that Sanders's shootout with police did not have any bearing on his character for truthfulness or dishonesty. *See* JA 486–92.

## III. ANALYSIS OF THOMAS'S SENTENCE

Review of a district court's decision to impose an obstruction of justice enhancement pursuant to U.S.S.G. section 3C1.1 is a three step process. First, we review the district court's findings of fact underlying the enhancement for clear error. Next, the district court's conclusion that a given set of facts constitutes obstruction of justice is a mixed question of law and fact that we review *de novo.* Finally, once the district court has determined that the defendant has obstructed justice, the enhancement is mandatory and we review the district court's action *de novo. See United States v. Chance,* 306 F.3d 356, 389 (6th Cir.2002) (citing *United States v. Middleton,* 246 F.3d 825, 846 (6th Cir.2001)).

■ Based on the conduct reviewed above, there was no clear error in the finding that Thomas threatened to have Sanders killed if he testified. Nor was there any error in the district court's conclusion that such conduct constituted obstruction of justice as defined by U.S.S.G. § 3C1.1. Accordingly, the district court was required to enhance Thomas's offense level by two, as it did. *See United States v. Angel,* 355 F.3d 462, 475–76 (6th Cir. 2004) (upholding obstruction enhancement for intimidating or threatening to kill witness); *United States v. Brown,* 237 F.3d 625, 626–28 (6th Cir.), *cert. denied,* 532 U.S. 1030, 121 S.Ct. 1981, 149 L.Ed.2d 772 (2001) (same).

For all the foregoing reasons we affirm the district court.