*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2004 FED App. 0285P (6th Cir.)
File Name:  04a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

KENNETH QUIGLEY,
*Defendant-Appellant.*

Nos. 03-2495;
04-1160

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-80992—John Corbett O'Meara, District Judge.

Submitted:  August 5, 2004

Decided and Filed:  August 30, 2004

Before:  KENNEDY, SUTTON, and COOK, Circuit
Judges.

---

### COUNSEL

**ON BRIEF:**  Michael J. Rex, Walter J. Piszczatowski,
HERTZ, SCHRAM & SARETZKY, Bloomfield Hills,
Michigan, for Appellant. Jennifer M. Gorland, ASSISTANT
UNITED STATES ATTORNEY, Detroit, Michigan, for
Appellee.

---

### OPINION

---

KENNEDY, Circuit Judge.  Defendant appeals his sentence
pursuant to a plea agreement in a wire fraud case.  Defendant
argues that the district court erred in its determination of the
loss amount for the purposes of identifying the sentencing
guidelines range.  While we agree that the district court erred
in its determination, we affirm the sentence imposed because
the corrected loss amount would still keep Defendant in the
same range.

### BACKGROUND

This case arises out of a scheme to defraud which occurred
from approximately May 1997 through May 1998. The
government described the scheme as follows:

> The fraud occurred when defendants, through their
> mortgage company, First Finance, Inc., used funds
> borrowed from their warehouse lender, Pinnacle
> Mortgage Warehouse ("Pinnacle") for purposes other
> than closing mortgage loans.  Sterling Bank & Trust
> ("Sterling") was the ultimate source of the warehouse
> funds, and therefore the victim for purposes of
> restitution.

First Finance, Inc. ("First Finance) was a Michigan
corporation with its principal place of business located in
Bloomfield Hills, Michigan.  It was founded in 1993 by
Randall Sage, who was charged separately for his conduct.
From about 1993 until May 1998, First Finance engaged in
the business of originating and selling residential mortgage
loans.  In 1994, Defendant became an investor in First
Finance. In the fall of 1996, he became a working partner and
shareholder.  At that point, the three principal shareholders of

First Finance were Randall Sage, Robert Geissbuhler,[1] and Defendant. A Voting Agreement executed between the three reflected that each became a one-third owner of the corporation with Randall Sage holding 51 percent of the voting stock. All three were signatories on the Surety Agreement that accompanied the Mortgage Warehouse and Security Agreement between Pinnacle and First Finance ("MWS Agreement").

First Finance dealt directly with the consumer by processing loan applications and arranging for financing. Sterling provided the loan money through Pinnacle, which acted as an administrator for the mortgage funding. Upon notification by First Finance that a loan note had been signed by an individual borrower, Pinnacle wired funds for the loan from an account in New York to a settlement trust account that First Finance maintained. First Finance would then disburse the funds when the mortgage closed. Money was advanced to First Finance pursuant to the terms of the MWS Agreement. That agreement specified that First Finance was to use the funds for the purpose of closing loans it originated. The agreement also required First Finance to return the funds to Pinnacle if the closing did not occur as scheduled. Sterling funded about 98 percent of each loan that First Finance originated. First Finance advanced the other 2 percent (the "haircut), expecting to recoup not only the haircut, but also an additional premium of 4 to 8 percent of the loan value when it ultimately sold the loan to another company, typically Advanta Mortgage.

Due to a high volume of mortgages that First Finance was closing, Pinnacle funded them in groups (or clusters). Some mortgages would close on time, some would be delayed, and some would not close at all. Often, First Finance did not immediately return the money for the mortgages that did not

---

[1]Robert Geissbuhler was not named as a co-defendant to the wire fraud charge.

close. Over the course of its relationship with Pinnacle, First Finance, instead of closing mortgage loans with the money that had been specifically deposited into the settlement trust account, frequently transferred that money from the settlement trust account into its general operating account in order to cover, on a temporary basis, general operating expenses, including the payment of salaries, benefits, and other expenses.

As part of the MWS Agreement, First Finance assigned to Pinnacle as security each and every mortgage or evidence of indebtedness, right, title, or interest in any insurance; all property of First Finance in possession of Pinnacle; and all causes of actions, claims, or demands that First Finance had or might acquire in connection with the mortgages. Pinnacle, in turn, assigned to Sterling all its rights, title, and interest in the Participation Agreements (which included mortgage loans originated by First Finance as security) as part of a Participation Purchase Agreement between the two parties. Accordingly, Sterling had a security interest (through Pinnacle) in each of the loans closed by First Finance. It also retained a security interest in each and every instance of indebtedness, loan, and asset belonging to First Finance.

First Finance ceased its business operations in May of 1998. At that time, Sterling immediately executed its rights under its Participation Purchase Agreement, which was cross-collateralized through the MWS Agreement between Pinnacle and First Finance, and obtained all First Finance originated loans. It later sold these loans at a profit.

On December 4, 2001, the government filed an Information charging Defendant Kenneth Quigley with one count of wire fraud in violation of 18 U.S.C. § 1343. On February 4, 2002, Defendant appeared before the magistrate judge, signed a formal waiver of indictment, and was arraigned on the Information. On June 13, 2002, Defendant appeared before the district court and entered a plea of guilty to the charge. After extensive negotiations, the plea was entered pursuant to

a Rule 11 plea agreement ("Agreement) in which the parties agreed on all sentencing guideline factors, except for U.S.S.G. § 2F1.1(b)(8)(B) (relating to offenses from which the defendant derived more than $1,000,000 in gross receipts) and U.S.S.G. § 2F.1.1(b)(1)(N) (relating to the amount of loss). Prior to sentencing, the government concluded that § 2F1.1(b)(8)(B) did not apply in this case and, accordingly, it was not factored into the guideline calculation. The Agreement contained a sentencing agreement of no more than 41 months' imprisonment with an understanding that the government would file a motion for downward departure based on substantial assistance and recommend a sentence range of 18 to 24 months, "or a similar percentage reduction if the court determines a lower guideline range is applicable." The Agreement also provided that the district court would enter an Order of Restitution in an amount "up to $2,353,151.00, less those amounts recovered by Pinnacle Warehouse Mortgage or Sterling Bank & Trust."

Following Defendant's plea, the Probation Department prepared the Presentence Investigation Report ("PSI") in which it determined that Defendant's total offense level was 21 (including a twelve-level adjustment under § 2F1.1(b)(1)(N) for loss exceeding $1,500,000.) The PSI listed the total loss to Sterling as $2,353,151 for sentencing purposes. Defendant filed numerous objections to the PSI, including an objection to the amount of loss, arguing that the figure did not reflect the profits Sterling made on the sale of the collateralized mortgages it acquired when First Finance ceased operations. The Probation Department responded by saying that "the amount was provided by the government and the case agent," that the issue "will be decided by the Court," and that the report will remain unchanged. Prior to sentencing, Defendant filed his Sentencing Memorandum, addressing a number of issues, including the loss figure. The Memorandum explained the manner in which Sterling was protected through its Participation Purchase Agreement with Pinnacle and the MWS Agreement between Pinnacle and First Finance. The Memorandum showed that when Sterling

exercised its rights under the two cross-collateralized agreements, it obtained receivables in excess of $20 million. This amount represented not only the principal amount of the loans that Sterling funded, but also a premium in the 6 percent to 8 percent range, plus recovery of the 2 percent "haircut," the amount initially funded by First Finance. Sterling also seized another $5,806,510 worth of loans originated by First Finance and funded them directly, thereby eliminating Pinnacle's involvement and guaranteeing recovery of the entire premium on those loans. In addition, the Memorandum identified a number of wire transfers from Advanta Mortgage directly to Sterling, which reflected the payment of the principal amount loaned by Sterling on a number of mortgages, in addition to the premium that would have gone to First Finance had it not ceased operations.

The government did not respond to Defendant's Sentencing Memorandum but did file a Combined Motion and Brief for a Downward Departure pursuant to U.S.S.G. § 5K1.1. Citing the Probation Department's calculated guideline range of 24 to 30 months for Defendant, the government recommended that the court depart downward and sentence Defendant to a term of imprisonment between 12 to 15 months due to the substantial assistance that Defendant rendered.

On October 24, 2003, Defendant appeared for sentencing. The defense counsel attempted to address Defendant's objection to the loss, an objection that was specifically preserved in the Rule 11 Plea Agreement. The court did not permit the defense counsel to make that argument, ruling that the issue had been already raised and resolved the previous day during the sentencing of Randall Sage. The defense counsel informed the court that there was a significant difference between the two defendants because Defendant Quigley had specifically preserved the issue whereas his co-defendant Sage had not. The trial court acknowledged that the restitution figure, to be determined at a later hearing, would be substantially smaller than the loss figure, but indicated that it was not going to do anything different from

what it had previously indicated it would do, namely grant the Motion for Downward Departure.

When the trial court asked the government if it wanted to add anything, the government argued that the $2.3 million loss figure represented the loss intended by the defendants. The government also argued that the false loan application cases[2] Defendant cited in support of his position that the loss figure should be offset by that which was recouped by security or pledge had no bearing on the present case. The trial court reiterated that it was not going to do anything differently since it had granted the downward departure motion. The court imposed a sentence of incarceration of twelve months and one day in the custody of the Bureau of Prisons. Additionally, the court ordered restitution in the amount to be determined at a later hearing.

For the purposes of determining the restitution figure, the government started with a loss figure of $2,413,788.50.[3] This amount represented 46 separate mortgages for which money had been wired into the settlement trust account, but had never closed. The government, however, acknowledged that this figure should be offset by (1) the payments Sterling received for loans that were originated by First Finance and subsequently sold to Advanta Mortgage and for which a 4 percent premium and a 2 percent "haircut" were realized and paid directly to Sterling instead of First Finance ($373,768.28); and (2) the amount realized through the seizure of First Finance Loans pursuant to the cross-

---

[2]False, or fraudulent, application cases involve situations where the creditor lies about the value of the collateral to obtain a more favorable loan.

[3]It is unclear why the restitution calculation started with a $2,413,788.50 loss rather than a $2,353,151 loss identified in PSI. We do not resolve this ambiguity because it does not affect the outcome of this case. We proceed on the assumption that $2,413,788.5 is the proper starting point for the loss amount calculation.

collateralization agreements ($803,409.90). Defendant also insisted that the restitution figure should be offset by 6 percent of an additional $5,806,510 in loans that had been listed on the "Sterling Advantage Line," or $384,390. On January 20, 2004, the parties appeared at the restitution hearing where they stipulated to credit Defendant with offsets reducing the restitution figure from $2,413,788.50 to $907,251.84 (or an offset of $1,506,536.66).[4] The court then considered the allocation of restitution among the parties and ordered that Defendant be held responsible for 50 percent of the total restitution, or $453,625.92.

## ANALYSIS

We review a district court's findings under the Guidelines under the clearly erroneous standard. *United States v. Clay*, 346 F.3d 173, 178 (6th Cir. 2003). The application of the Guidelines to factual findings is a question of law subject to *de novo* review. *United States v. Finkley*, 324 F.3d 401, 403 (6th Cir. 2003).

Defendant argues on this appeal that the district court erred when it failed to make the requisite findings of fact concerning the amount of loss used in arriving at the sentencing guideline range. The government presents two distinct arguments for affirming Defendant's sentence. For the reasons stated below, we reject those arguments.

First, the government argues that the district court was not required to resolve the factual dispute concerning the amount of loss from Defendant's fraud because the ultimate sentence would not be affected. According to the government, Defendant was sentenced to twelve months and one day,

---

[4]It is unclear how the parties arrived at that figure since it represents an offset greater than what the government acknowledged ($1,177,178.18) but less than what the government acknowledged coupled with what Defendant additionally insisted upon ($1,561,568.18).

making him eligible for "good conduct time" credits awarded by the Bureau of Prisons to prisoners who receive a sentence of more than 12 months. 28 C.F.R. § 523.20 (an inmate earns 54 days of "good conduct time" credits for each year served). The government, therefore, argues that Defendant would actually only serve 312 days under his current sentence. On the other hand, if the trial court had accepted Defendant's argument on the loss amount, the government would have been obligated to recommend a sentence in the range of 10 ½ to 13 ½ months. Relying on the fact that the district court sentenced Defendant to 12 months and 1 day when the government recommended a sentence between 12 and 15 months, the government argues that the district court, if it accepted Defendant's argument, would have sentenced Defendant to at least 10 ½ months, or 315 days, *or 3 days longer* than his current sentence. We reject this argument because, as Defendant points out, the district court may have a number of sentencing options available to it that would affect either the term or the conditions of the sentence. We cannot categorically reject such a possibility.

Second, the government argues that the district court properly used the "intended loss" amount of $2,413,788.50 for the sentencing purposes. The absence of a district court opinion and a very perfunctory brief from the government complicate our review in this case. However, as explained below, we find that the district court clearly erred in determining the loss amount.

"In challenging the court's loss calculation, [the appellant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but was outside the realm of permissible computations." *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994). Defendant argued before the district court and before this Court that the loss amount should have been reduced to the restitution amount because the victim bank was able to use other collateral to offset its losses. As support for his argument, Defendant cites fraudulent loan application cases

where the bank was able to satisfy at least one part of the debt by foreclosing on the underlying collateral. *See, e.g., United States v. Wright*, 60 F.3d 240, 241 (6th Cir. 1995) (loss amount should be offset by assets pledged to secure the loan). The government insists that those cases have no relevance here because Defendant's "fraud in this case was the use of the funds for purposes other than the purchase of an asset or other collateral." Appellee Br. at 13 (citing U.S.S.G. § 2F1.1, Application Note 8(b) (reducing the amount of loss by "any assets pledged to secure the loan" that was obtained through a fraudulent application). We agree that the fraudulent loan application cases are technically different from the case at hand. However, we find them (and the Application Notes related to them) extremely relevant to the question of the valuation of an intended loss. In both types of cases, a Defendant obtains a loan under false pretenses while providing the lender with some collateral. The lender is thus able to offset some of his loss through the use of the collateral. The Guidelines provide that in the case of a false loan application, the district court should reduce the amount of loss by the amount recovered. We see no reason, nor have we been provided with one by either the district court or the government, as to why the district court in this case should not have reduced the $2,413,788.50 loss by the amount recovered by reason of the cross-collateralization agreement.

Having concluded that the district court erred by not reducing the $2,413,778.50 loss amount, we now undertake a *de novo* analysis of what that offset should have been. We do so because Defendant has admitted to all facts relevant to the legal question presented. Sterling obtained three categories of assets when it exercised its rights under the cross-collateralization agreements: (1) cash that represented the profit from loans originated by First Finance, fully funded, and subsequently sold to Advanta ($373,768.28); (2) loans that were originated by First Finance and were fully funded, but were not yet sold to Advanta; (3) loans that were originated by First Finance but were not yet funded, and, therefore, not yet sold to Advanta. Of the three categories, we

find that only the first one is relevant to the offset determination.

We agree with Defendant that the $373,768.28 of cash should be used to offset the gross loss amount because it cannot be said that First Finance intended to deprive Sterling of the entire $2.4 million when it knew, with absolute certainty, that Sterling had a fully-enforceable security interest in that amount as the proceeds from the sale of the underlying loans.

The situation, however, is different with respect to categories (2) and (3). With respect to category (2), Sterling obtained loans in the amount of $13 million that First Finance originated, fully funded, and was about to sell to Advanta. Defendant argues that he is entitled to an offset equal to the profit that First Finance would have made had it been allowed to sell the loans to Advanta ($803,409.90). We disagree. Unlike cash in category (1), the profit on the sale of loans was a mere expectancy. First Finance was *virtually* assured of the profit because of its contractual relationship with Advanta, but it was not *guaranteed* that the sale would take place or that the amount realized would be as expected. It is possible that some event may have intervened to prevent First Finance from making the profit, thereby depriving Sterling of the funds. With respect to category (3), Sterling obtained loans in the amount of approximately $5.8 million that were originated by First Finance. Sterling then funded those loans and sold them to Advanta resulting in a "lost profit" to First Finance of $384,390. As with category (2), we find that Defendant is not entitled to an offset that represents a profit that First Finance *may have* earned if it funded the loans and sold them.

Since we find that the only appropriate offset is for $373,768.28, the proper loss amount for the sentencing purposes is approximately $2 million. This amount is within the same range ($1.5 million to $2.5 million) as the loss amount ($2.4 million) that the district court used to establish

Defendant's sentence under the Guidelines. Accordingly, there is no need to remand for resentencing.

## CONCLUSION

For the reasons stated above, we affirm Defendant's sentence in this case.