**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0514n.06
Filed: July 19, 2007

**No. 06-4157**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CLAYTON B. SMITH,

    Defendant-Appellant.

                               /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

**BEFORE:**    **CLAY, GILMAN,** and **MCKEAGUE**, **Circuit Judges.**

    **CLAY, Circuit Judge.** Defendant Clayton B. Smith appeals his conviction on two counts of mail fraud in violation of 18 U.S.C. § 1341, one count of wire fraud in violation of § 1343, and one count of bank fraud in violation of § 1344(1). Defendant pled guilty to all counts, but argues on appeal that there was an insufficient factual basis to support this plea and seeks to withdraw it. He additionally contends that his sentence was improper because it was imposed pursuant to an incorrect version of the U.S. Sentencing Guidelines. For the reasons set forth below, we **AFFIRM** the district court's order.

**STATEMENT OF FACTS**

**Factual History**

The following is the recitation of the facts of this case that was consented to by Defendant:[1]

Beginning in July 2001, and continuing through the end of December 2001, Clayton B. Smith, entered into a scheme to defraud various securities brokers by causing such brokers to purchase securities on his behalf knowing that he did not have the funds to pay for such purchases. As part of the scheme, the defendant did knowingly cause envelopes containing confirmations of securities purchased to be deposited in an authorized depository for mail as delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 and 2.

On or about August 29, 2001, Clayton B. Smith, for the purpose of executing a scheme to defraud, did knowingly cause to be transmitted in interstate commerce, by means of a wire communication, a facsimile of a copy of a check drawn on his bank account to Schneider Securities, Inc. in Rochester, New York, a violation of 18 U.S.C. § 1343.

On or about October 9, 2001, through October 16, 2001, Clayton B. Smith, for the purpose of executing a scheme to defraud did knowingly defraud Second National Bank in Warren, Ohio, by depositing checks from an account he held at the Legacy Bank which contained insufficient funds.

(J.A. II at 3). Importantly, when Defendant purchased securities from the brokers, they retained an interest in the securities, and were authorized to sell those securities if Defendant was unable to pay.

**Procedural History**

Defendant pled guilty on all four counts and was sentenced on February 24, 2006. The district court began by acknowledging that the parties had agreed to the use of the 2001 version of the U.S. Sentencing Guidelines, which is consistent with the time period in which Defendant engaged in his unlawful conduct. The Guideline that applies to fraud violations is § 2B1.1(a). Pursuant to that provision, the court found that Defendant's base offense level was six. The court

---

[1]At the sentencing hearing, the government recited a more detailed version of the facts, which is lengthier than that found in the indictment. At the hearing, Defendant and his counsel orally consented to the accuracy of the more detailed account and, additionally, reiterated Defendant's admission to the factual history contained in the indictment, which Defendant signed.

determined that the actual loss suffered by various brokers as a result of Defendant's scheme was $68,285.95. However, the court calculated that the intended loss was $413,681.50. Thus, the court further applied a fourteen-level enhancement for an intended loss of more than $400,000 but less than $1,000,000, pursuant to § 2B1.1(b)(1)(H). (J.A. at 65). Finally, the court reduced the offense level by two for acceptance of responsibility. This placed Defendant's base offense level at eighteen; and with his criminal history at category I, Defendant's sentencing guideline range was twenty-seven to thirty-three months of imprisonment.

Defendant objected to the calculation of his intended loss and contended that the court properly should have applied only a six-level enhancement because the actual loss suffered by the victims was more than $30,000, but less than $70,000. The court held that while Defendant was correct about the range of the actual loss, § 2B1.1 requires consideration of both the intended and actual loss suffered by the victims as a result of Defendant's conduct, and it instructs to use the greater of the two figures to impose any applicable enhancements. Defendant responded that because the victims retained an interest in the securities he purchased, and because they subsequently sold those securities, his intended loss should be offset by the amount they received by selling the securities. However, the court reasoned that because the security in which the victims retained an interest was a stock, the value of the interest was merely an expectancy and was therefore not guaranteed. The court observed that while there were no cases directly dealing with this issue, it argued that in similar cases, we have held that such a speculative interest cannot be counted to offset an intended loss because no amount of collateral was guaranteed to the victim. Thus, the court overruled Defendant's objections. After considering a number of § 3553(a) factors, including

3

Defendant's advanced age, the fact that he was the father of two children, and the seriousness of the offense, the court sentenced Defendant to twenty-seven months in prison. Defendant timely filed a notice of appeal. Defendant is no longer represented by counsel and proceeds with this appeal *pro se*.

## DISCUSSION

### I. The Factual Basis for Acceptance of Defendant's Guilty Plea

#### A. Standard of Review

We review a defendant's challenge to the factual basis for the court's acceptance of a guilty plea for abuse of discretion. *United States v. Bennett*, 291 F.3d 888, 894 (6th Cir. 2002). However, when a defendant fails to object on Rule 11 grounds before the district court, as Defendant failed to do in this case, the defendant must demonstrate plain error in order to prevail. *United States v. Vonn*, 535 U.S. 55, 59 (2002). While Defendant objected to the inclusion of his intended loss in the district court's calculation of his base offense level, he did not object on the grounds that there were insufficient bases to accept the guilty plea. Thus, we will proceed under a plain-error analysis.

"Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice." *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988). Plain error occurs when "(1) there was an error, (2) that is clear and obvious, and (3) that affects substantial legal rights" and 4) where that error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Angel*, 355 F.3d 462, 469 (6th Cir. 2004).

#### B. Analysis

According to Federal Rule of Criminal Procedure 11(b)(3), "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Thus, Defendant will be able to show that an error occurred if he can show that this rule was violated. When faced with a challenge to the sufficiency of the factual basis for a defendant's guilty plea, we consider "whether the record of the plea hearing . . . establishes a factual basis for all the elements of" the offense pled. *United States v. Tunning*, 69 F.3d 107, 112 (6th Cir. 1995). Further, "[w]here the crime is easily understood, several courts have held that a reading of the indictment . . . and an admission by the defendant, is sufficient to establish a factual basis under Rule 11." *United States v. Williams*, 176 F.3d 301, 313 (6th Cir. 1999) (quoting *United States v. Edgecomb*, 910 F.2d 1309, 1313 (6th Cir. 1990)) (internal quotation marks omitted). We have previously stated that § 1341 violations are sufficiently easy to comprehend, such that they require only the recitation of the indictment in order to establish a factual basis under Rule 11. *See United States v. Byrd*, 2007 U.S. App. LEXIS 8096, *18 (6th Cir. 2007). Finally, as we have held before, "where a plea agreement contained a factual basis supporting the counts to which defendant pled guilty, and both defendant and his attorney agreed to the paragraph's accuracy, a sufficient factual basis had been presented." *United States v. Baez*, 87 F.3d 805, 810 (6th Cir. 1996).

The elements of a violation of 18 U.S.C. § 1341 are: "(1) a scheme to defraud and (2) the mailing of material for the purpose of executing the scheme." *United States v. Stull*, 743 F.2d 439, 441-42 (6th Cir. 1984). In other words, the defendant must have a scheme to defraud, the intent to defraud, and must use the mail in order to further that scheme. *See id*. A violation of § 1343 requires a showing of the same elements as § 1341, except that instead of a requirement that the U.S.

mail is used, it has a requirement that an interstate wire is used. *See United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994).[2]

At the sentencing hearing, both Defendant and his attorney agreed to the oral recitation of these facts and reiterated their consent to the written account as well. Both the oral recitation and the facts section of the indictment, which Defendant signed, clearly state all the elements of the fraud violation, including that Defendant had the requisite intent to defraud his victims. Accordingly, Defendant is faced with the incredibly difficult task of arguing that despite the fact that he signed the indictment and agreed to the recitation at the sentencing hearing, the facts presented at the sentencing hearing make it impossible to believe that he was guilty of each element of the fraud violations. *See Baez*, 87 F.3d at 810.

Defendant argues that because of the nature of his account of his dealings with the victims, it was impossible for him to have intended to defraud his victims, and thus, there was no factual basis supporting the plea. The purchases that form the basis for this offense were made through a "margin account." A margin account differs from a "cash account" in that a margin account allows the broker to retain an interest in the security. Therefore, if the purchaser is unable to settle his or her account, the broker may simply liquidate the security to settle the account. Essentially, in a margin account, the broker acts as a creditor to the purchaser. Defendant argues that it is effectively impossible to intend to defraud a broker with a margin account because the nature of the transaction guarantees that the broker is insured against fraud.

---

[2]An examination of Defendant's brief reveals that he does not appeal his conviction under § 1342, which involves the use of a fictitious or incorrect name or address for the purpose of completing a § 1341 violation. *See* 18 U.S.C. § 1342.

Defendant likens the use of a margin account to traditional secured-loan-fraud cases. Defendant points out that we have typically offset the amount of loss in secured-loan-fraud cases by the amount that the defendant pledged in order to secure the loan. *See United States v. Quigley*, 382 F.3d 617, 622 (6th Cir. 2004); *United States v. Wright*, 60 F.3d 240, 241 (6th Cir. 1995). Defendant relies heavily on *Quigley* for this proposition, but fails to address the fact that in *Quigley* we explicitly stated that non-cash collateral held by the victim will not be relevant to the amount of loss determination. *Id*. at 623. Envisioning precisely the scenario before us today, we differentiated a situation where a victim held a guaranteed amount in collateral from the defendant (as was the case in *Quigley* with respect to one category of the loans at issue, *see id*. at 622) from a situation where the victim would most likely generate *some* amount, but it was impossible to tell how much (as was the case with the other category of loans at issue in *Quigley*, *see id*. at 623, and with the accounts in the instant case). With respect to the second category of loans, we held that the defendant could make no argument that the victim received collateral where the amount of such collateral was entirely speculative. Specifically, this Court stated:

> [T]he profit on the sale of loans was a mere expectancy. [The mortgage lender] was virtually assured of the profit because of its contractual relationship with [a third party], but it was not guaranteed that the sale would take place or that the amount realized would be as expected. It is possible that some event may have intervened to prevent [the mortgage lender] from making the profit, thereby depriving [the victim] of the funds. With respect to category (3), [the victim] obtained loans in the amount of approximately $ 5.8 million that were originated by [the mortgage company]. [The victim] then funded those loans and sold them to [a third party] resulting in a "lost profit" to [the mortgage company] of $ 384,390. As with category (2), we find that [the] [d]efendant is not entitled to an offset that represents a profit that [the mortgage company] may have earned if it funded the loans and sold them.

*Id*.

Thus, by analogy, it would not make sense to relieve Defendant of intent to defraud simply because the nature of his transaction with his victims was such that they *could* have recovered funds with the sale of the stock. In determining loss, the amount of loss Defendant reasonably intended must be our guide. *See United States v. Tager*, 788 F.2d 349, 355 (6th Cir. 1986). Essentially, Defendant forced the victims into a gamble that could have resulted in them 1) recovering their investment; 2) recovering some percentage of their investment; or 3) recovering nothing. The fact that it was possible that outcome one or two could have resulted does not deter a finding that Defendant had the requisite intent to defraud. Nor does it negate the fact that Defendant engaged in this scheme knowing it was also possible for the victims to recover nothing. Under these facts, Defendant certainly cannot meet the high burden required to establish plain error. *Angel*, 355 F.3d at 469. Because the record clearly indicates that Defendant admitted that he did, in fact, have the intent to defraud, his argument is unpersuasive. *See Baez*, 87 F.3d at 810. Thus, we are convinced that the district court's decision to accept Defendant's guilty plea did not result in plain error.

## II.      Computation of Defendant's Sentence

### A.      Standard of Review

Generally, we review the district court's interpretation of the Sentencing Guidelines *de novo*. *United States v. Palacios-Suarez*, 418 F.3d 692, 694 (6th Cir. 2005). However, our only role with respect to this issue is to determine whether the district court complied with the stipulation of the parties as to which version of the Guidelines was to be used, and not to review its interpretation. Defendant failed to object to the version of the Guidelines the district court used at trial, so Defendant must demonstrate that the use of the November 2001 Guidelines resulted in plain error.

As we stated above, plain error occurs when "(1) there was an error, (2) that is clear and obvious, and (3) that affects substantial legal rights," and 4) where that error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Angel*, 355 F.3d at 469.

**B.     Analysis**

"Generally, the district court is instructed to apply the version of the Guidelines in place at the time of sentencing." *United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005); *see also* § 1B1.11(a). However, where application of the version of the Guidelines in place at the time of sentencing would amount to a violation of the *ex post facto clause*, this Court must apply the version of the Guidelines in place at the time of the defendant's offense. *Id.*; *see also* § 1B1.11(a), (b)(1), cmt.6 (2002).

In the instant case, it is undisputed that the parties consented to the use of the 2001 Guidelines, but it was never expressly stated what version of the 2001 Guidelines were to be used. Accordingly, the district court should have applied the version that was in place during the time of Defendant's offense. *Davis*, 397 F.3d at 346. The district court applied the version of the Guidelines that had been amended as of November 1, 2001, whereas Defendant argues that the court should have used the version that was in affect January 1, 2001 to coincide with the events of Defendant's fraudulent conduct. Thus, this issue will turn on when Defendant's offense can be said to have taken place. If Defendant's offenses were completed before November 1, 2001, the court's use of the November Guidelines would constitute error.[3]

_____

[3]It is worth noting that the differences between the November 1, 2001 version and the January 1, 2001 version of the Guidelines may not be sufficient to rise to the level of an *ex post facto* violation. *See Miller v. Florida*, 482 U.S. 423, 430 (1987). Thus, even if Defendant could show that

The factual account of this case, to which Defendant clearly consented and we find was properly accepted, states that his mail-fraud activities continued through December 2001, which means that the November 2001 Guidelines would be the most appropriate. This is further substantiated by the fact that the government presents evidence that unlawful purchases of securities occurred after November 1, 2001, specifically those made through L&M Financial Services. Accordingly, we hold that it was proper to apply the November 1, 2001 version of the Guidelines, and the district court did not commit plain error.

**CONCLUSION**

For the forgoing reasons, we **AFFIRM** the district court's order.

---

his offenses were complete before November 1, 2001, he may not be able to show that this error violated the *ex post facto* clause, and accordingly, would be unable to show that any legal right was affected. Such an inquiry, however, is not necessary for this analysis because the facts indicate that the November 1, 2001 version is the most appropriate version to apply.

**RONALD LEE GILMAN, Circuit Judge, concurring.** I write separately to express my disagreement with the district court's calculation of the "intended loss" attributable to Smith for sentencing purposes. Because Smith does not challenge this calculation on appeal, however, instead relying solely on the argument that he did not possess the requisite intent to defraud in the first place, I concur rather than dissent.

The lead opinion relies on *United States v. Quigley*, 382 F.3d 617 (6th Cir. 2004), for the proposition that "non-cash collateral held by the victim will not be relevant to the amount of loss determination." Lead Op. at 7 (citing *Quigley*, 382 F.3d at 623). But Comment 2(E)(ii) to U.S.S.G. § 2B1.1 (2001), the relevant Guidelines section, provides as follows:

> *In a case involving collateral pledged or otherwise provided by the defendant, [loss shall be reduced by] the amount the victim has recovered at the time of sentencing from disposition of the collateral*, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

(Emphasis added.)

The italicized language directly describes the situation in the present case, and instructs that the intended loss attributable to Smith be reduced by the "the amount the victim[s] . . . recovered" when they liquidated Smith's unpaid stock. (Like my colleagues, I assume that the "loss" in Comment 2(E)(ii), which appears as Comment 3(E)(ii) in the 2006 Guidelines, refers to "intended loss." *See also Quigley*, 382 F.3d at 622 ("[W]e find [the fraudulent loan application cases] (and the Application Notes related to them) extremely relevant to the question of the valuation of an *intended loss*.") (emphasis added).)

11

Moreover, the words "fair market value" under the second scenario contemplated by Comment 2(E)(ii) clearly advise that even what the lead opinion characterizes as "mere expectancies"—i.e., non-cash collateral—should factor into the intended-loss calculation. The reasoning in *Quigley*, in other words, is very difficult to square with the language of the Guidelines themselves. Indeed, if only "guaranteed" or fixed cash-type collateral counted, as the lead opinion and *Quigley* suggest, then the words "fair market value" would be mere surplusage. We should of course be reluctant to construe a Guidelines provision, as with any statute or rule, in a manner that reads readily understandable terms right out of it. *See Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 716 (6th Cir. 2006) (reiterating the basic principle, derived from "accepted canons of statutory interpretation," that surplusage is "a result we are to avoid whenever possible").

I also note that the factual circumstances in *Quigley*—where the "victim" was a mortgage-lending company that had issued loans based on false pretenses, and had not yet sold the loans to offset its losses by the time of sentencing—are sufficiently distinguishable from those in the present case so as to preclude *Quigley* from being the binding authority that the lead opinion makes it out to be. In any event, to the extent that the language from *Quigley* quoted by the lead opinion is contrary to my analysis as set forth above, I would simply reiterate the Supreme Court's admonition that, in attempting to quantify matters involving securities and loss, "form should be disregarded for substance and the emphasis should be on economic reality." *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also United States v. Blood*, 435 F.3d 612,

12

630 (6th Cir. 2006) ("We have emphasized that the intended loss must . . . reflect economic reality.") (quotation marks omitted).

The district court's attribution of nearly $414,000 in intended loss to Smith in the present case ignores the value of the brokers' liquidated security interests, and thus fails to reflect "economic reality." Their actual loss was roughly $68,000, and because this amount more closely reflects economic reality than a loss of 100% of the purchase price of the securities, it should also be the measure of the "intended loss" under U.S.S.G. § 2B1.1. To argue that Smith intended for the brokers to lose 100% of the purchase price if he did not timely pay necessarily implies that the pledged securities would lose all of their value in a matter of four business days (cited in the record as the "clearing period" for the relevant stock purchases), an argument that is totally bereft of "economic reality." I nonetheless concur in the judgment because Smith has not appealed this determination.